UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD E. KAPLAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  C.A. No. 04-10402-NMG |
| | )  C.A. No. 05-10320-NMG |
| FIRST HARTFORD CORPORATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## PLAINTIFF RICHARD E. KAPLAN'S PRETRIAL PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The plaintiff, Richard E. Kaplan, hereby submits his pretrial proposed findings of fact and conclusions of law, reserving the right to submit additional and/or supplemental proposals at the conclusion of the trial of these consolidated cases.

### PRETRIAL PROPOSED FINDINGS OF FACT

1.      The Common Stock of First Hartford Corporation ("FHC") is registered under Section 12(g) of the Securities Exchange Act of 1934 (the "Exchange Act"). This action arises from three proxy statements that FHC mailed to its shareholders. The first (the "Option Plan Proxy Statement") was mailed on December 29, 2003 for a meeting held on January 22, 2004 at which the shareholders elected directors and voted on FHC's 2003 Stock Option Plan. The second (the "Shareholder Proposal Proxy Statement") was mailed on January 31, 2005 for a meeting held on February 24, 2005 at which the shareholders elected directors and voted on plaintiff's shareholder proposal to require independent directors to be included in the FHC Board. The third (the "Ratification Proxy Statement") was mailed on October 28, 2005 for a meeting held on November 30, 2005 at which shareholders elected directors, and voted on

ratifying the 2003 Stock Option Plan and certain Nonqualified Options and Put Options granted by FHC.

2.     This litigation concerns whether those proxy statements conform with the requirements of the Proxy Rules promulgated by the Securities Exchange Commission pursuant to Section 14(a) of the Exchange Act.

3.     Richard E. Kaplan is a shareholder of FHC and has been such at all times relevant to the three meetings.

4.     FHC is controlled by Neil H. Ellis, who controls at least 42.9% of its stock and serves as its President and one of its three directors. The other two directors are Stuart Greenwald and David Harding, who are FHC employees.

5.     From February 13, 1986 to January 22, 2004, a period of almost 18 years, FHC held no shareholder meetings. FHC's corporate records reflect that during the same period there were only 7 meetings of its Board of Directors.

6.     During the February 1986 to January 2004 period, Ellis engaged in numerous acts of self-dealing with FHC and its subsidiaries. For example, prior to 1994, FHC had a 75% interest in a partnership which owned a shopping center in Lubbock, Texas, the other 25% of which was owned by the bank providing financing for the project. In 1994, Ellis caused FHC to enter into a series of transactions which resulted in FHC owning only a 1% interest in the partnership, with the other 99% owned by a corporation owned by Ellis and his wife. In 1989, Ellis caused FHC to exchange an apartment project known as Scitico Gardens for an industrial property that Ellis owned through a corporation. At the time of these transactions, FHC had no independent accountants; none of these transactions was authorized by the Board of Directors;

2

and none was evaluated for fairness by any qualified third party. None of these transactions has ever been fully described to shareholders in a proxy statement.

7.    In 2003, Ellis decided to have FHC adopt a Stock Option Plan, for which he would need shareholder approval. For that reason, he determined to have a shareholder meeting in January 2004. As required by the Proxy Rules, FHC mailed the Option Plan Proxy Statement to shareholders in December 2003.

8.    At the time the Option Plan Proxy Statement was mailed, FHC was very unusual for a public company: (i) although Maine law required annual shareholder meetings, FHC had gone almost 18 years without a shareholder meeting, (ii) FHC had no outside directors, and one of its directors (Harding) had joined the Board by invitation of Ellis, without any formal election, (iii) Ellis alone determined his own compensation and that of the other directors, (iv) FHC did not have an audit committee, a nomination committee or a compensation committee; (v) FHC's directors rarely met as a board, and (vi) FHC's directors engaged in numerous acts of self-dealing transactions on terms that are not fully documented, approved by the Board, or fully disclosed in FHC's filings with the SEC.

9.    Rather than disclose the true facts to shareholders, Ellis and Greenwald prepared the Option Plan Proxy Statement using the standard statements typically found in proxy statements, in order to provide an aura of regularity and without regard to the truth of such statements as they applied to FHC. This was a common theme in all three Proxy Statements.

10.    For the Shareholder Proposal Proxy Statement and the Ratification Proxy Statement, Ellis and Greenwald corrected certain defects that the plaintiff, Kaplan, had identified in his complaints, but left others, and generally avoided making full disclosures.

11.    The Option Plan Proxy Statement refers to the January 2004 meeting as an "Annual Meeting." However, that meeting was not an "Annual Meeting" in any sense. It was not "annual" since there had been no shareholder meeting in the preceding 18 years; nor was it an "Annual Meeting" under the FHC By-Laws, which at the time specified that the Annual Meeting be held on the last Tuesday in September, not in January. The omitted disclosure -- that FHC had not held a shareholder meeting in almost 18 years -- was a factor that a reasonable shareholder would have considered relevant in determining how to vote on the two items of business: the re-election of directors who had not called a shareholder meeting in many years, and the adoption of a Stock Option Plan to provide additional compensation to some of those same directors.

12.    The Option Plan Proxy Statement omitted to disclose all known owners of 5% or more of FHC's common stock "as of the most recent practicable date" as required by Item 6(d) of Schedule 14A (referencing Reg. S-K, Item 403). Instead, FHC disclosed information as of April 30, 2003, almost 9 months earlier. The difference was material because by using the April 30 date rather than a recent date, FHC omitted to disclose that Joel Lehrer had filed a Schedule 13D with the SEC on December 8, 2003 disclosing ownership of 5.6% of FHC's common stock, and John Filippelli had filed a Schedule 13D with the SEC on December 11, 2003 disclosing that he owned 6.4% of the FHC common stock. Because there is so little trading in FHC stock, the most recent practicable date for Item 6(d) purposes was no more than a few days before the mailing of the Proxy Statement. For example, in the Ratification Proxy Statement, FHC found it practicable to disclose the stock ownership information as of the day before the mailing.

4

13.    Item 7(b) of Schedule 14A (referencing Reg. S-K, Item 405) required FHC to tell shareholders whether its officers and directors had complied with the reporting requirements of Section 16(a) of the Exchange Act.  FHC chose to respond to this requirement with standard language:

> "To our knowledge, based solely on review of copies of such reports furnished to First Hartford and representations by [Messrs. Ellis, Greenwald and Harding] that no other reports were required, all required reports have been filed on a timely basis on behalf of all persons subject to these requirements."

This was standard language that had no applicability to FHC.  In FHC's case, no such reports were furnished and no such representations were made.  More significantly, Ellis, Greenwald and Harding were each delinquent in their filings.

14.    The Option Plan and Shareholder Proposal Proxy Statements say that "First Hartford does not have an audit committee and accordingly its entire Board of Directors fulfills the functions of an audit committee."  However, the Board of Directors of FHC had not fulfilled the functions of an audit committee.

15.    For the Ratification Proxy Statement, FHC changed its formulation to identify the audit committee functions that the Board claims to fulfill.  However, it does not inform shareholders of the audit committee functions that are not performed in FHC.  Omitting this disclosure, in this context, is misleading to all but the most sophisticated of shareholders.

16.    The Option Plan and Shareholder Proposal Proxy Statements state "First Hartford does not have a compensation committee and accordingly its entire Board of Directors fulfills the role of compensation committee."  This was untrue.  While both proxy statements also disclose that Neil Ellis was solely responsible for all major compensation decisions, including setting his own compensation, the inclusion of the statement concerning the Board of Directors would be

misleading to a reasonable shareholder who might reasonably infer (incorrectly) that the Board of Directors was exercising some oversight.

17.    To improve its position on this issue, in the Ratification Proxy Statement, FHC narrowed its claim to say that "First Hartford does not have a separately designated compensation committee, but its entire Board of Directors fulfills some of the functions of a compensation committee." However, the only compensation committee function that the Board had fulfilled was to engage a compensation consultant which, as of the date of the proxy statement, had not yet submitted a report. Read in context, the paragraph is misleading because it implies that there are other compensation committee functions fulfilled by the Board.

18.    The 5-Year Performance Graphs included in each of the Proxy Statements are misleading because they omit to disclose that the "value" of the FHC stock depicted on the graphs is based on "market prices" that would not be available to an FHC shareholder wanting to sell more than a token number of shares.

19.    The description of Ellis's business experience found in each of the Proxy Statements is misleading in omitting to disclose Ellis's real estate activities on behalf of Scitico Gardens and Lubbock Shopping Center, two properties formerly owned by FHC and now owned (through various corporations) by Ellis and his wife. Without disclosure of such information, shareholders might reasonably believe that Ellis is not involved in any competing real estate activities.

20.    The Proxy Statements do not fairly describe the transactions between Ellis and FHC. A major omission concerns FHC's Putnam Parkade subsidiary. As part of a 2000 loan from Ellis's Journal Publishing, Putnam Parkade agreed to pay Journal Publishing not only interest at prime plus 1% (which would be consistent with the Proxy Statement disclosure) but

also 95% of the economic interest in the Putnam Parkade property (95% of the cash flow from the property, and 95% of the net proceeds on any sale of the property). Ellis has contended that contrary to the provisions of the Note evidencing the transaction (which he signed on behalf of Putnam Parkade) and the description found on page 31 of FHC's 10-K Report filed with the SEC for the fiscal year ended April 30, 2000, it was never his intention to take 95% of the cash flow or sale proceeds. This is not credible. The Ratification Proxy Statement notes the October, 2004 refinancing of the Putnam Parkade loan in which the holder of the second mortgage – Journal Publishing, owned by Ellis and his wife -- was repaid and released a stock pledge. However, the Ratification Proxy Statement does not say that Journal Publishing had released its 95% participation interest. The first document evidencing that release is a so-called "confirmation" signed by Journal Publishing in January, 2006. Moreover, regardless of Ellis's "intention," the documents are clear, and had Ellis met with an untimely demise prior to the January 2006 "confirmation" there is no reason to believe that Journal Publishing would have released its rights. Regardless of whether Ellis always intended to release Journal Publishing's claims to 95% of the cash flow or net proceeds of Putnam Parkade, as of the dates of the respective Proxy Statements, Ellis had not released those claims and their omission from the Proxy Statements was misleading.

21.     The Option Plan Proxy Statement, at page 8, under the heading "Certain Business Relationships," describes Hartford Lubbock LP as a limited partnership of which Journal Publishing owns 99% of the partnership interests, and states that Ellis is the President of Journal Publishing. The proxy statement says that Hartford Lubbock paid management fees to FHC in the fiscal year ended April 30, 2003 in the amount of $283,943, an amount in excess of 5% of Hartford Lubbock's gross revenues for the fiscal year. This is intended to give shareholders a

favorable impression of Ellis, but is misleading because it omits to disclose to shareholders that (as described above) Ellis obtained his interest in Hartford Lubbock from FHC in a transaction that was not approved by the Board, evaluated for fairness by any qualified third party, or fully disclosed in FHC's SEC filings. The terms of that transaction are necessary in order to put in context the management fees that FHC now receives from the property in which its ownership interest was reduced from 75% to 1% while Ellis took a 99% interest.

22.    Each of the Proxy Statements omits to disclose as compensation to Ellis payments totaling about $60,000 per year made by Hartford-Lubbock Limited Partnership II to Ellis's daughters at Ellis's direction. It is clear that these payments were not for services to Hartford-Lubbock Limited Partnership II and were made solely because Ellis directed them. The payments that Ellis directed from this FHC-controlled entity to members of his family should have been disclosed to shareholders as compensation to Ellis, and are material in relation to his compensation as reported in the Proxy Statements.

23.    The description of Harding found in each of the Proxy Statements reads as follows:

> David B. Harding has been a Vice President of First Hartford since 1992. He was the President of Richmond Realty, LLC, a real estate management company, from January 1996 to January 2003. In the past, Richmond Realty managed certain properties of First Hartford, but currently it only manages property of others. He has been a member of the Board of Directors since 1998.

This is false and misleading because it implies that Harding no longer works for Richmond Realty (which manages real estate in competition with FHC), and that Richmond Realty no longer does business with FHC. In fact, Harding continues to own Richmond Realty and to operate it as its Vice President. While Harding has installed his wife as President, Harding has said that she is President "on paper only." A shareholder reading the Proxy Statements would

8

also be surprised to learn (because they have never been told) that Richmond Realty operates out of the FHC premises, often using FHC employees and with funding from FHC. Moreover, property owned by Ellis represents a substantial portion of the management business of Richmond Realty.

24.    Each of the Proxy Statements omits to disclose FHC's unwritten agreement with Richmond Realty under which FHC bears the net costs of the management services provided by Richmond Realty to Ellis's Scitico Gardens apartment project.

25.    During the periods covered by the Proxy Statements, FHC advanced funds to Richmond Realty, which is owned by David Harding and his wife. At various times the amount owing from Richmond Realty to FHC was in excess of $60,000. The Proxy Statements do not disclose the existence or amounts of these loans, although required by Item 7(c) of Schedule 14A (by reference to Item 404(b) of Reg. S-K).

26.    The Ratification Proxy Statement, in response to the requirements of Item 7 of Schedule 14A, states: "The Board of Directors gives consideration to director candidates recommended by shareholders in accordance with the procedures described under "Proposals of Shareholders" on page 2. The Board of Directors does not have a specific process for identifying and evaluating nominees for director, but when considering nominations for membership on the Board, the Board of Directors seeks to identify persons who have the highest capabilities, judgment and ethical standards and who have an understanding of our business." A reasonable shareholder would infer from this that the Board had considered director candidates recommended by shareholders. This is misleading in light of the fact that, as of the date of the Ratification Proxy Statement, the Board of Directors of FHC had not given consideration to even

one director nominee other than the current members of the Board, all of whom were picked by Ellis.

27.    The discussion of the 2003 Stock Option Plan included in the Option Plan Proxy Statement is misleading because it does not disclose the Board intended to, or even might, attempt to issue Put Options under the Plan.

28.    The Ratification Proxy Statement asks shareholders, in two separate proposals, to ratify separate grants of Non-Qualified Options and Put Options.  However, the Non-Qualified Options and Put Options referenced in the Ratification Proxy Statement were not given as separate grants, but as combined grants.  The FHC Board considered the grant of Non-Qualified Options and Put Options to be made under the 2003 Stock Option Plan.  The 2003 Stock Option Plan, as described to shareholders in the Option Plan Proxy Statement, did not include Put Options. The description in the Ratification Proxy Statement of the grants is misleading, and designed to conceal from shareholders the fact that the Board had attempted to issue, under the Stock Option Plan, Put Options not authorized by the Stock Option Plan.

29.    Both the Option Plan Proxy Statement and the Ratification Proxy Statement, in describing the Stock Option Plan shareholders are asked to approve, advised shareholders that options granted under the Stock Option Plan would qualify as "performance-based compensation" for the purposes of Section 162(m) of the Internal Revenue Code.  This was misleading in omitting to disclose that the Nonqualified Options actually issued do not qualify as "performance-based compensation" because they were issued in combination with Put Options guaranteeing a profit whether or not the FHC stock price went up, and even if it went down. This omission is particularly important in the context of the Ratification Proxy Statement in which the

shareholders are asked to ratify the Nonqualified Stock Options that do not comply with Section 162(m).

30.    In the Shareholder Proposal Proxy Statement, in recommending that shareholders vote against the Kaplan shareholder proposal to amend the By-Laws by providing for an at least 80% independent Board of Directors, management disparaged Kaplan's efforts as "under the guise of good corporate governance," when, they said, those efforts were merely the continuation of a family feud ongoing for 25 years and "another front in this internecine battle." This was false and misleading.  Though Kaplan had some peripheral involvement when Ellis had sued Ellis's own father and Kaplan's father more than 20 years earlier, suits 20 years apart, between different parties, are not fairly characterized as a 25 year feud.

31.    Management also said, in urging the defeat of Kaplan's shareholder proposal, that "The Board of Directors takes action on matters that each director believes to be, in the exercise of his fiduciary responsibilities, in the best interest of First Hartford as a whole, and *all* of its shareholders." (emphasis in original) This is untrue.  The Board very rarely meets, and permits self-dealing without board approval or evaluation for fairness by any independent party.  The Board permitted FHC to operate for 9 years without an outside auditor, during which time properties that had belonged to FHC became properties of Ellis and his entities.  Significantly, the Board has caused FHC and its subsidiaries to enter into transactions with Board members and their related entities that are either undocumented, as in the case of the arrangement between FHC and Richmond Realty, or allegedly on terms contradictory to the documents as Ellis contends in the case of the loan from Journal Publishing to Putnam Parkade.  During the past year, the Board met only twice, during which they considered only three actions:  (a) suing Kaplan, (b) indemnifying themselves, and (c) ordering a compensation consultant report to

11

justify increasing their compensation. None of these actions were taken with a view to the interests of any shareholder other than Ellis.

32. The foregoing misstatements and omissions are material, and taken as a whole, the misstatements and omissions in each Proxy Statement would have been considered important by a reasonable shareholder in deciding how to vote on each of the matters presented in such Proxy Statement.

33. The foregoing misstatements and omissions were the result of knowing, reckless or negligent conduct on the part of FHC.

## PRETRIAL PROPOSED CONCLUSIONS OF LAW

1. This is a proxy fraud case brought by a shareholder ("Kaplan") of a publicly held corporation ("FHC") against the corporation for violation of the federal securities laws. The case is brought by an individual who has owned of record and beneficially, with sole voting power over, more than 1,000 shares of the common stock of FHC for the past 10 years. By bringing this case, Kaplan seeks to insure fairness of the internal corporate voting process of FHC, and to prevent management of the corporation (in particular its President Neil H. Ellis) from obtaining authorization for corporate action by the use of deceptive or inadequate disclosures in proxy solicitation. See J.I. Case Co. v. Borak, 377 U.S. 426, 431 (1964); TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438 (1976) (proxy rules bar use of proxy statements that are false or misleading with respect to the presentation or omission of material facts).

2. These consolidated cases are governed by the Securities Exchange Act of 1934, 15 U.S.C. Section 78n(a) *et seq.*, enacted for the protection of the investing public in securities transactions. Congress has declared that: "It shall be unlawful for any person . . . to solicit or to permit the use of his name to solicit any proxy . . . in respect of any security . . . registered on

any national securities exchange in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." Id.

3.    Pursuant to this power, the SEC has promulgated its Regulation 14A containing rules governing proxy solicitations. The standard against which soliciting materials are to be measured is set down by the SEC in its Rule 14a-9, which provides: "No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting, or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." See Union Pacific Railroad Co. v. Chicago and North Western Railway Co., 226 F. Supp. 400, 406-412 (N.D. Ill. 1964) (recognizing beneficial requirement of meticulous disclosure demanded by federal securities laws, to substitute full disclosure for caveat emptor and thus to achieve a high standard of business ethics in the securities industry); Securities and Exchange Commission v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186-187 (1963).

4.    A corporation must divulge all known material facts in its proxy materials so shareholders can make informed choices. Desaigoudar v. Meyercord, 223 F.3d 1020, 1024 (9th Cir. 2000), cert. denied, 532 U.S. 1021 (2000). There must be a full and honest disclosure. Beatty v. Bright, 318 F. Supp. 169, 174 (S.D. Iowa 1970). "A proxy statement should honestly, openly and candidly state all the material facts, making no concealment of the purposes for the proposals it advocates. Unlike poker where a player must conceal his unexposed cards, the

object of a proxy statement is to put all one's cards on the table face-up." <u>Mendell v. Greenberg</u>,
927 F.2d 667, 670 (2nd Cir. 1991).

5.    "The Supreme Court has stressed the importance of Rule 14a-9 to informed
voting by shareholders.  It has said that fair corporate suffrage is an important right; that Rule
14a-9 is intended to promote free exercise of voting rights by stockholders; and that Rule 14a-9
is necessary for the protection of shareholders. . . .  [S]hareholders must not be misled." <u>Gillette</u>
<u>Co. v. RB Partners</u>, 693 F. Supp. 1266, 1269 (D. Mass. 1988) (Wolf, J.) (citations omitted). <u>See</u>
<u>N.E. Anti-Vivisection Soc., Inc., v. U.S. Surgical Corp., Inc.</u>, 889 F.2d 1198 (1st Cir. 1989)
(proxy statement must fully and fairly set forth the relevant and material facts from which the
reasonable shareholder may draw own conclusions as to how to vote).

6.    False or misleading statements of material fact are actionable.  Rule 14a-9.  A
statement may be false or misleading for purposes of Section 14(a) even though it would not
support an action for common law fraud or deceit. <u>Union Pacific Railroad Co.</u>, supra, at 408.

7.    The question of materiality is an objective one:  the significance of an omitted or
misrepresented fact to a reasonable investor. <u>TSC Indus., Inc.</u>, supra, at 445-449.  Materiality
means what a hypothetical reasonable shareholder would deem significant. <u>Berg v. First</u>
<u>American Bankshares, Inc.</u>, 796 F.2d 489 (D.C. Cir. 1986).  If there is a substantial likelihood
that a reasonable shareholder would consider the fact important in deciding how to vote, it is a
material fact. <u>TSC Indus., Inc.</u>, supra, at 438.  Any doubts with respect to materiality should be
resolved in favor of those the statute is designed to protect:  investors and shareholders. <u>TSC</u>
<u>Indus., Inc.</u>, supra, at 448.

8.    The plaintiff need not show that but for the material deception or omission the
vote of the shareholders would have been different (<u>i.e.</u>, the plaintiff need not show reliance, just

materiality). <u>Mills v. Electric Auto-Lite Co.</u>, 396 U.S. 375 (1970). ". . .[A]lthough Section 14(a) requires any party soliciting proxies, regardless of his status or interest in the transaction, to disclose all material information, a self-dealing insider may have a 'heavier burden of disclosure' in the sense that he will find it more difficult to convince the court that he has met the requirements of Section 14(a)." <u>Pavlidis v. New England Patriots Football Club, Inc.</u>, 737 F.2d 1227, 1231 (1st Cir. 1984).

9.     Where there has been a finding of materiality, a shareholder makes a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. <u>Mills v. Electric Auto-Lite Co.</u>, 396 U.S. 375, 385 (1970).

10.     The plaintiff has the burden to prove (i) that the proxy materials contain a false or misleading statement of material fact or omit to state a material fact necessary to make the statement not false or misleading; and (ii) that the misstatement or omission was the result of knowing, reckless, or negligent conduct. <u>Gillette Co. v. RB Partners</u>, supra, at 1269, citing <u>Plant Industries, Inc. v. Bregman</u>, 490 F. Supp. 265, 269 (S.D.N.Y 1980); <u>Kennecott Copper Corp. v. Curtiss-Wright Corp.</u>, 449 F. Supp. 951, 956 (S.D.N.Y), aff'd in part, 584 F.2d 1195 (2d Cir. 1978).

11.     Where a proxy fraud complaint alleges misrepresentations in or omissions from the proxy solicitation materials, the court must evaluate the materiality of the alleged defects. It cannot ignore the allegations of the complaint and engage in "mind reading" to speculate about the plaintiff's "true" motivation in filing the complaint. <u>Berg. v. First American Bankshares, Inc.</u>, supra, at 498 n.8.

12.    Certain information is required by the securities laws to be disclosed to shareholders in proxy statements.    The requirements are set out in 17 C.F.R. Section 240.14a-101, known as Schedule 14A.   Schedule 14A consists of several "Items," and incorporates the requirements of several "Items" contained in Regulation S-K (17 C.F.R. Part 229).  In addition, all requirements of Schedule 14A are qualified by the anti-fraud provisions of SEC Rule 14a-9(a), 17 C.F.R., Section 240.14a-9(a):

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

13.    Schedule 14A, Item 7 requires FHC to furnish the information required by Item 404(a) of Regulation S-K for all directors and nominees for director.   It must disclose information about transactions between them and the registrant, in this case FHC, and between any member of their immediate family (spouse, parents, children, in-laws) and the registrant, or any series of similar transactions, in which the amount involved exceeds $60,000.   17 C.F.R. Section 229.404(a).

14.    Information with respect to any person who is known to the registrant to be the beneficial owner of more than 5% of any class of the registrant's voting securities must be given in a proxy statement "as of the most recent practicable date."  Item 403, Regulation S-K.  A registrant is deemed to know the contents of statements filed with the SEC pursuant to Schedule 13(d).  Instruction 3 to Item 403.  See Schedule 14A, Item 6.

15.    If a director, officer or nominee or any corporation or organization of which any such person is an officer or partner is indebted to the registrant or any of its subsidiaries at any time since the beginning of the last fiscal year in an amount in excess of $60,000, certain information must be disclosed in the proxy statement, including the nature of the indebtedness and the transactions giving rise to the indebtedness and the largest aggregate amount of indebtedness outstanding.  Schedule 14A, Item 7; Item 404(c), Regulation S-K.

Respectfully submitted,

RICHARD E. KAPLAN,
Plaintiff,

By his attorneys,


/s/ Larry C. Kenna
Larry C. Kenna (BBO No. 267760)
Robert Rothberg (BBO No. 430980)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
(617) 248-5000

Dated:  May 11, 2006

4079373v2