UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RICHARD E. KAPLAN, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action Nos. |
| | ) | 04-10402-NMG |
| FIRST HARTFORD CORPORATION, | ) | 05-10320-NMG |
| | ) | 06-01424-NMG |
| *Defendant.* | ) | CONSOLIDATED |
| | ) | |

**DEFENDANT FIRST HARTFORD CORPORATION'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to the order of this Court, defendant First Hartford Corporation ("FHC") respectfully submits these Proposed Findings of Fact and Conclusions of Law. FHC reserves the right to supplement, amend, or modify these findings and conclusions following the completion of the trial.

## I.    PROPOSED FINDINGS OF FACT

### A.    First Hartford Corporation

1.    FHC is a Maine corporation with its principal place of business in Manchester, Connecticut.

2.    FHC is engaged in the purchase, development, ownership, and management of real estate.

3.    Neil Ellis is the President and a director of FHC, as well as the owner, directly or beneficially, of approximately 43% of FHC's common stock, i.e., 1,325,387 shares.

4.    Stuart Greenwald is the Treasurer and Secretary and a director of FHC.

5.    David Harding is a Vice President and a director of FHC.

6.      FHC's Board of Directors is comprised of Neil Ellis, Stuart Greenwald, and David Harding.

7.      FHC's common stock is registered pursuant to Section 12(g) of the Securities Exchange Act of 1934.

8.      There are approximately 3,046,279 outstanding shares of FHC common stock.

9.      FHC's shares are traded over the counter and not listed on any exchange.

10.     Richard E. Kaplan ("Kaplan"), the plaintiff in this action, is the beneficial owner of approximately 19.4% of FHC's common stock, i.e., 591,254 shares.  Kaplan and his brother, David Kaplan, share voting power over 445,535 of these shares, which are owned by one or more trusts.  Kaplan has never attempted to sell his shares or buy additional shares.

11.     In 1981, FHC filed a Petition for Reorganization under Chapter 11 of the United States Bankruptcy Code.  FHC successfully emerged from bankruptcy in 1987.  The interests of FHC's shareholders were unimpaired in the Chapter 11 case.  Since that time, and owing to the uncertainty of FHC's financial stability, lenders that finance FHC have required that Mr. Ellis and, in some instances, entities owned directly or indirectly by Mr. Ellis and his wife, personally guaranty certain loans to FHC and its subsidiaries.

12.     Neither Mr. Ellis nor any other guarantor received remuneration in exchange for providing a guaranty in connection with any such loan.

**B.      The Proxy Statements And Shareholders' Meetings**

13.     On December 29, 2003, FHC distributed proxy materials in connection with the January 22, 2004 Annual Meeting of the Shareholders (the "January 2004 Meeting") at which the shareholders were to elect directors and act on a proposal to adopt the 2003 Stock Option Plan (the "Stock Option Plan").

-2-

14.     At the January 2004 Meeting, the shareholders voted to: (i) elect to the Board of Directors Messrs. Ellis, Greenwald, and Harding; and (ii) adopt the Stock Option Plan.

15.     Holders of 2,601,991 shares voted in favor of electing Messrs. Ellis, Greenwald, and Harding as directors of FHC, and holders of 2,262 shares abstained from voting. Holders of 1,631,870 shares voted in favor of the Stock Option Plan, and holders of 19,346 shares voted against it. Kaplan neither voted his shares nor abstained in connection with the election of directors.

16.     On January 26, 2005, FHC distributed proxy materials in connection with the February 24, 2005 Annual Meeting of the Shareholders (the "February 2005 Meeting") at which the shareholders were again to elect directors and act on a proposal from Kaplan requiring 80% of the board to be independent ("Kaplan's Shareholder Proposal").

17.     At the February 2005 Meeting, the shareholders voted to: (i) elect as directors once again Messrs. Ellis, Greenwald, and Harding; and (ii) reject Kaplan's Shareholder Proposal.

18.     Holders of 2,193,860 shares voted in favor of electing Mr. Ellis as a director of FHC; holders of 2,194,110 shares voted in favor of electing Messrs. Greenwald and Harding as directors of FHC; and holders of 651,261 shares were withheld from voting. Holders of 662,672 shares voted in favor of Kaplan's Shareholder Proposal, and holders of 1,860,706 shares voted against the proposal.

19.     In October 2005, FHC distributed proxy materials in connection with the November 30, 2005 Annual Meeting of the Shareholders (the "November 2005 Meeting") at which the shareholders were again to elect directors and vote on a proposal to ratify the Stock Option Plan.

20.    At the November 2005 Meeting, the shareholders voted to: (i) elect Messrs. Ellis, Greenwald, and Harding as directors once again; and (ii) ratify the Stock Option Plan.

21.    Holders of 2,115,891 shares voted in favor of electing Messrs. Ellis, Greenwald, and Harding as directors of FHC, and holders of 652,961 shares withheld their votes. Holders of 1,905,150 shares voted in favor of ratifying the Stock Option Plan; holders of 674,734 shares voted against it; and holders of 3,000 shares abstained from voting. Holders of 1,904,849 shares voted in favor of ratifying the Stock Options Grant; holders of 674,789 shares voted against it; and holders of 3,255 shares abstained from voting. Holders of 1,895,749 shares voted in favor of ratifying the Put Options Grant; holders of 680,834 shares voted against it; and holders of 3,310 shares abstained from voting.

## II.    PROPOSED CONCLUSIONS OF LAW

### A.    Section 14(a) of the Securities Exchange Act

1.    Kaplan asserts claims in Civil Actions Nos. 05-10320-NMG and 06-01424-NMG arising from purported violations of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) (the "Securities Exchange Act"). Kaplan's Complaint in Civil Action No. 04-10402-NMG asserts mistakenly violations of § 14(e) of the Securities Exchange Act, which addresses tender offers. See 15 U.S.C. § 78n(e).

2.    Section 14(a) of the Securities Exchange Act prohibits any person from soliciting proxies "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for protection of investors" 15 U.S.C. § 78n(a). The SEC subsequently promulgated Rule 14a-9, which provides as follows:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, <u>at the time and in the light of the circumstances under which it is</u>

made, is false or misleading with respect to any material fact, or
which omits to state any material fact necessary in order to make
the statements therein not false or misleading or necessary to
correct any statement in any earlier communication with respect to
the solicitation of a proxy for the same meeting or subject matter
which has become false or misleading.

17 C.F.R. § 240.14a-9 (emphasis added).

3.     A plaintiff establishes a violation of Section 14(a) and Rule 14a-9 by
demonstrating that:  (1) the proxy statement contains a material misrepresentation or omission;
(2) the defendant is chargeable with some degree of culpability or fault; and (3) the proxy caused
an injury to the plaintiff (i.e., the proxy was an "essential link" in the challenged transaction).
See Royal Bus. Group, Inc. v. Realist, Inc., 933 F.2d 1056, 1063 (1st Cir. 1991); Mendell v.
Greenberg, 612 F. Supp. 1543, 1548 (S.D.N.Y. 1985), aff'd, 927 F.2d 667 (2d Cir. 1990); In re
BankAmerica Corp. Sec. Litig., 78 F. Supp. 2d 976, 988-89 (E.D. Mo. 1999).

4.     A misrepresentation or omission "is material if there is a substantial likelihood
that a reasonable shareholder would consider it important" in making an investment decision.
TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); New England Anti-Vivisection
Soc., Inc. v. U.S. Surgical Corp., 889 F.2d 1198, 1202 (1989).  "[T]o fulfill the materiality
requirement there must be a substantial likelihood that the disclosure of the omitted fact [or the
absence of the misrepresentation] would have been viewed by the reasonable investor as having
significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485
U.S. 224, 231-32 (1988) (citations omitted); see also Gebhardt v. ConAgra Foods, Inc., 335 F.3d
824 (8th Cir. 2003) (materiality should be judged from perspective of reasonable investor at the
time of misrepresentation, not from perspective of investor looking back); Parnes v. Gateway
2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997).

-5-

5.       The U.S. Supreme Court has analogized this "reasonable investor" standard to a jury's application of the "reasonable man" standard in negligence cases. <u>TSC Indus.</u>, 426 U.S. at 450 n.12.

6.       "The purpose of section 14(a) is to provide full and fair disclosure from which shareholders may draw their own inferences, and make their decisions on how to vote." <u>Mendell</u>, 612 F. Supp. at 1548 (citing <u>Mills v. Elec. Auto-Lite Co.</u>, 396 U.S. 375, 381 (1970)). "Therefore, proxy materials need not be perfect, but must simply convey a 'sufficiently accurate picture so as not to mislead.'" <u>Id</u>. (quoting <u>Kennecott Copper Corp. v. Curtiss-Wright Corp.</u>, 584 F.2d 1195, 1200 (2d Cir. 1978)).

7.       "[C]orporations are not required to address their stockholders as if they were children in kindergarten." <u>New England Anti-Vivisection</u>, 889 F.2d at 1202 (citing <u>Richland v. Crandall</u>, 262 F. Supp. 538, 554 (S.D.N.Y. 1967)).  Moreover, "[c]ourts do not sit in proxy disputes as professors of English literature engaged in an exercise of textural deconstruction." <u>Id</u>. at 1203.

8.       "The trier of fact is uniquely competent to determine materiality, as that inquiry requires delicate assessments of inferences a reasonable investor would draw from a given set of facts." <u>In re Control Date Corp. Sec. Litig.</u>, 933 F.2d 616, 621 (8th Cir. 1991) (internal quotation marks and citation omitted).

9.       "It is well settled that a proxy statement need not characterize disclosed information," <u>Mendell</u>, 612 F. Supp. at 1550 (citing cases), "[n]or does the law require inclusion of statements which are implicit or self-evident . . . or information as to which shareholders have access equal to that of defendants, or of which shareholders should already be aware." <u>Id</u>. at 1551 (citing cases).

10.    In addition, a company need not disclose in its proxy statements information that it is not legally obligated to disclose.  See Resnik v. Swartz, 303 F.3d 147, 151 (2d Cir. 2002). "Disclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor.  For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information." Id. at 154.

11.    Moreover, a company need not include in its proxy statement information that is already available to the shareholders in the public domain.  See, e.g., Flum Partners v. Child World, Inc., 557 F. Supp. 492, 499 (S.D.N.Y. 1983).

12.    A proxy statement also "need not set forth subjective motivations underlying the vote of a director or controlling shareholder as long as all the material facts regarding their personal interests are disclosed." Mendell, 612 F. Supp. at 1553 (citing cases).

13.    The disclosure policy embodied in the proxy regulations is not without limit.

> Some information is of such dubious significance that insistence on its disclosure may accomplish more harm than good.  The potential liability for Rule 14a-9 violation can be great indeed, and if the standard of materiality is unnecessarily low, not only may the corporation and its management be subjected to liability for insignificant omissions or misstatements, but also management's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information -- a result that is hardly conducive to informed decision making.

TSC Indus., 426 U.S. at 448-9.  Likewise, "[a]lleged misrepresentations may also present or conceal such insignificant data that, in the total mix of information, it simply would not matter to a reasonable investor." Parnes, 122 F.3d at 547.

14.    To demonstrate a violation of Section 14(a), a plaintiff must prove that the proxy statement was the "essential link" in accomplishing the proposed action.  See Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1087 (1991); Dominick v. Marcove, 809 F. Supp. 805, 807 (D. Colo. 1992).  "[T]his essential link cannot be proven where . . . approval by the

minority shares is not legally required to authorize the transaction." <u>Dominick</u>, 809 F. Supp. at

807; <u>see also</u> <u>Gorman v. Coogan</u>, No. 03-173-P-H, 2004 U.S. Dist. LEXIS 301, at \*56 n.26  (D.

Me. Jan. 13, 2004); <u>Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Fieldcrest</u>

<u>Cannon, Inc.</u>, No. 93 Civ. 3580, 1993 U.S. Dist. LEXIS 10691, at \*2 (S.D.N.Y. Aug. 4, 1993).

Approval by the minority shares is "not legally required" where "[t]he transaction would have

occurred even if the minority shareholders had known the truth and voted against the

transaction." <u>Dominick</u>, 809 F. Supp. at 807; <u>see also</u> <u>Gorman</u>, 2004 U.S. Dist. LEXIS 301, at

\*56 n.26; <u>Amalgamated Clothing</u>, 1993 U.S. Dist. LEXIS 10691, at \*2.

**B.    The Proxy Statements**

15.    Kaplan has failed to prove that there were any material misrepresentations or

omissions in the proxy materials distributed in connection with the January 2004 Meeting (the

"January 2004 Proxy Statement"), the February 24, 2005 Meeting (the "February 2005 Proxy

Statement"), and the November 2005 Meeting (the "November 2005 Proxy Statement").

16.    Specifically, Kaplan has failed to prove that the January 2004 Meeting was a

Special Meeting, not an Annual Meeting.  Even if Kaplan had proven the foregoing, he has not

proved that it was material, <u>i.e.</u>, "would have been viewed by the reasonable investor as having

significantly altered the 'total mix' of information made available." <u>Basic</u>, 485 U.S. at 231-32.

A reasonable shareholder would have known that the January 2004 Meeting may have been a

Special Meeting because it was not scheduled to be held on the last Tuesday in September, as per

FHC's by-laws.

17.    Kaplan has failed to prove that the fact that the January 2004 Proxy Statement

failed to disclose that no FHC shareholder meeting had been held during the previous 18 years

was material, <u>i.e.</u>, "would have been viewed by the reasonable investor as having significantly

altered the 'total mix' of information made available." Id. FHC noted in its 10Ks, which it filed

with the SEC and distributed to its shareholders, that it had not held a shareholder meeting since

1986.

18.    Kaplan has failed to prove that the fact that the January 2004 Proxy Statement did

not disclose names of shareholders known by FHC to own more than 5% of common stock was

material, i.e., "would have been viewed by the reasonable investor as having significantly altered

the 'total mix' of information made available." Id. As the evidence has demonstrated, in the

February 2005 and October 2005 Proxy Statements, FHC disclosed the names of the four

shareholders owning 5% or more of FHC stock, two of which are Kaplan himself and his

brother, David Kaplan. Armed with this information, FHC's shareholders still voted to elect the

same slate of directors that they had elected and ratify the Stock Option Plan that they had

approved at the January 2004 Meeting. This demonstrates that the disclosure of the information

at issue was immaterial. Likewise, Kaplan has failed to demonstrate how the failure to identify

the other two shareholders owning more than 5% of FHC's common stock would have been

considered important by a reasonable shareholder in making an investment decision.

19.    Kaplan has failed to prove that the January 2004 Proxy Statement, the February

2005 Proxy Statement, and the November 2005 Proxy Statement misleadingly state that FHC's

Board serves the functions of an audit committee and a compensation committee. In all three

proxy statements, FHC stated that it did not have an audit or compensation committee. Kaplan

has adduced no evidence or pointed to any authority indicating that FHC was required to have

such committees. FHC also provided accurate information regarding the tasks that the Board of

Directors performed. Even if Kaplan had proven that the January 2004 Proxy Statement, the

February 2005 Proxy Statement, and the November 2005 Proxy Statement misleadingly stated

that FHC's Board serves the functions of an audit committee and a compensation committee, Kaplan has failed to prove that these purportedly misleading statements were material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id.

20.    Kaplan has failed to prove that the five-year performance graph in the Proxy Statements misleadingly suggests the price at which FHC shareholders could have sold their shares.  Rather, the evidence shows that the graph plots the total return on an investment in FHC stock at varying points in time based upon the price at which shares of FHC stock actually traded during those periods.  Kaplan himself acknowledges that the graph is accurate.  Moreover, the evidence shows that Kaplan and the other FHC shareholders have always been well aware that FHC's stock is not widely traded and not listed on any exchange and that, at any given time, a shareholder seeking to sell shares might not have been able to find a willing buyer at the desired price.  Even if Kaplan had proven that the five-year performance graph was misleading, he has not proved that this purportedly misleading graph was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id.

21.    Kaplan has failed to prove that the Proxy Statements did not disclose sufficient information about purportedly "self-dealing transactions."  First, Kaplan has not proved that FHC is required to include in its proxy statements information that was not otherwise included regarding the transactions entered into by FHC.  Second, all of the relevant information concerning transactions entered into by FHC is included in the company's filings with the SEC, which are publicly available to all shareholders.  Third, the Proxy Statements disclose significant information concerning transactions between Mr. Ellis and FHC.  (See January 2004 Proxy

-10-

Statement at 7-8; February 2005 Proxy Statement at 9-10; November 2005 Proxy Statement at 10-11.)

22.    Even if Kaplan had proven that the Proxy Statements did not contain sufficient information about transactions between Mr. Ellis and FHC, he has not proved that this alleged omission was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id.  For example, Kaplan makes reference to a loan made by Journal Publishing Company, Inc. ("Journal Publishing"), an entity owned by a company that is itself owned by Mr. Ellis and his spouse, to Putnam Parkade, Inc. ("PPI"), an FHC subsidiary.  Kaplan alleges that Mr. Ellis received payments in exchange for guaranteeing this loan.  As the evidence has demonstrated, Kaplan is incorrect.  As security for the loan from Journal Publishing, PPI executed a Note (the "Note") in favor of Journal Publishing that was secured by a mortgage on a property owned by PPI (the "Property").  Although the Note entitled Mr. Ellis to receive 95% of the cash flow payments from the Property in exchange for providing his personal guaranty, Mr. Ellis never sought nor received any such payments.  Then, in 2004, the Property was refinanced and Journal Publishing was repaid in full under the Note.  In connection with the repayment of the Note, the parties agreed to extinguish Mr. Ellis's theoretical right to receive cash flow payments, none of which he ever received.

23.    Kaplan has failed to prove that the January 2004 Proxy Statement makes misleading statements regarding the Stock Option Plan.  Even if Kaplan had proven that the January 2004 Proxy Statement contained misleading statements regarding the Stock Option Plan, he has not proved that such statements are material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 231-32.  The evidence has shown that the October 2005 Proxy

-11-

Statement included the information regarding the Stock Option Plan that Kaplan claims FHC should have included in its January 2004 Proxy Statement. At the November 2005 Meeting, equipped with this information, FHC's shareholders voted overwhelmingly to ratify the Stock Option Plan. That the shareholders cast the same votes after FHC remedied the alleged inadequacies in the proxy materials as they did before clearly demonstrates that none of the facts allegedly omitted from or misstated in the January 2004 Proxy Statement was material. See Cohen v. Ayers, 596 F.2d 733 (7th Cir. 1979) (holding that shareholders ratification of a stock option plan following disclosure of previously undisclosed information demonstrated that the information was immaterial).

24.    Kaplan has failed to prove that the fact that the January 2004 Proxy Statement Proxy states that FHC filed all required SEC reports despite the fact that Messrs. Greenwald and Harding had not filed their Form 3s was material. In the February 2005 Proxy Statement, FHC stated that Messrs. Greenwald and Harding may have been late to file their Form 3s with the SEC, which disclosed that each beneficially held no shares of FHC at that time. Despite now knowing this fact, at the February 2005 Meeting, the shareholders still voted to elect the same slate of directors (including Messrs. Greenwald and Harding) that they had elected and to ratify the Stock Option Plan that they had approved at the January 2004 Meeting. This demonstrates that the disclosure of the information at issue was not material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 231-32.

25.    Kaplan has failed to prove that the statement in the February 2005 Proxy Statement in opposition to Kaplan's Shareholder Proposal that "the Board of Directors acts on behalf of the best interest of all shareholders" was misleading. Even if Kaplan had proven the

-12-

foregoing, he has failed to prove that it was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. It is well-settled that "[g]eneral statements of optimism . . . are not actionable" under Section 14(a). In re Metricom Sec. Litig., No. C. #01-4085 PJH, 2004 U.S. Dist. LEXIS 7834, at *95 (N.D. Cal. Apr. 29, 2004); Guerra v. Teradyne Inc., No. 01-11789-NG, 2004 U.S. Dist. LEXIS 28548, at *44 (D. Mass. Jan. 16, 2004).

26.     Kaplan has not proved that the descriptions of the directors' business activities in the November 2005 Proxy Statement were deficient. The November 2005 Proxy Statement describes those activities on Pages 4 and 5 and 10 and 11 in sufficient detail. All activities that are similar to those carried on by FHC are sufficiently disclosed. Even if Kaplan had proven that the descriptions of the directors' business activities were deficient, he has failed to prove that this was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 231-32.

27.     Kaplan has presented no evidence that there have been any director nominees other than Messrs. Ellis, Greenwald, and Harding, or that the Board of Directors would not have given consideration to other director nominees had there been any. Even if Kaplan had proven the foregoing, he has not proved that the statement in the November 2005 Proxy Statement that the Board of Directors gives regular consideration to director nominees was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id.

28.     Kaplan has failed to prove that the summary compensation table in the November 2005 Proxy Statement is incomplete because it does not include value of all monetary and other benefits provided by FHC to nominees. The summary compensation table sets forth the total

compensation provided by FHC to Messrs. Ellis, Greenwald, and Harding. Kaplan has put forth no evidence that FHC was required to disclosure any additional information regarding the directors' compensation. Even if Kaplan had proven that the summary compensation table was incomplete, he has not proved that this fact was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id.

29.    Kaplan has failed to prove that Mr. Ellis and his companies have frequently borrowed from FHC. Even if Kaplan had proven the foregoing, he has not proved that this alleged omission was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. On the contrary, the evidence demonstrates that Mr. Ellis, directly and through entities owned by him and his wife, undertook repeated personal financial risks to assist FHC during difficult periods. FHC's shareholders, and Kaplan in particular, benefited from Mr. Ellis's actions.

30.    Kaplan has failed to prove that FHC made loans or extended credit to its directors. Even if Kaplan had proven the foregoing, he has not proved that any failure to disclose such was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id.

31.    Kaplan has failed to prove that the November 2005 Proxy Statement does not disclose business relationships other than Hartford Lubbock, and with respect to Hartford Lubbock does not disclose how Journal Publishing came to own a 99% limited partnership interest and FHC a 1% general partnership interest in Hartford Lubbock L.P., a transaction which occurred in 1994. Even if Kaplan had proven the foregoing, he has not proved that this alleged omission was material, i.e., "would have been viewed by the reasonable investor as having

significantly altered the 'total mix' of information made available." Id. There is no evidence that FHC was required to disclose any additional information about its business relationships or how Journal Publishing came to own a 99% limited partnership interest and FHC a 1% general partnership interest in Hartford Lubbock L.P. in 1994.

32.     Kaplan has failed to prove that the November 2005 Proxy Statement misleadingly states that "provisions have been included to meet the requirements for deductibility of executive compensation for the purposes of Section 162(m) of the Internal Revenue Code." This statement is not misleading. It does not state or even suggest that options have been granted under the plan that meet the requirements for deductibility. Rather, it states that the provisions have been put in place to address any such grants if they were to be made. Even if Kaplan had proven that this statement in the November 2005 Proxy Statement was misleading, he has not proved that this alleged misleading statement was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id.

33.     Kaplan has failed to prove that the November 2005 Proxy Statement does not disclose that Mr. Ellis determines the terms and conditions of each award under the Stock Option Plan. Even if Kaplan had proven the foregoing, he has not proved that this alleged omission was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. Kaplan has put forth no evidence that FHC was required to disclose that Mr. Ellis determines the terms and conditions of each award under the Stock Option Plan.

34.     Kaplan has failed to prove that the November 2005 Proxy Statement does not disclose that FHC approved a grant of Put Options. In fact, the November 2005 Proxy Statement states FHC's Board of Directors approved the grant of certain put options to each of the

employees who received a grant of non-qualified stock option. Even if Kaplan had proven the foregoing, he has not proved that this alleged omission was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id.

35.    Kaplan has failed to prove that the November 2005 Proxy Statement misleading suggests that pursuant to the Stock Option Plan non-qualified stock options and put options were granted separately when actually each of the participants received a single grant comprised of non-qualified stock options and put options. Even if Kaplan had proven the foregoing, he has not proved that this alleged misrepresentation was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id.

36.    Even if Kaplan had proven that the Proxy Statements contained material misrepresentations or omissions -- and he has not -- Kaplan has not demonstrated the necessary causal link to establish liability under Section 14(a) with respect to the votes taken at the January 2004 Meeting. In other words, Kaplan has not demonstrated that the votes of FHC's minority shareholders were necessary to authorize the election of directors at the January 2004 Proxy Statement. See Dominick, 809 F. Supp. at 807; see also Gorman, 2004 U.S. Dist. LEXIS 301, at *56 n.26; Amalgamated Clothing, 1993 U.S. Dist. LEXIS 10691, at *2.

37.    Even if Kaplan had proven a violation of 14(a) with respect to any of the Proxy Statements -- and he has not -- as this Court stated in its April 5, 2006 Memorandum and Order on First Hartford Corporation's Motion for Summary Judgment, "much of the relief initially sought by plaintiff would be pointless if awarded now (e.g., a revocation of the annual election of defendant's directors for 2004-05)." (Apr. 5, 2005 Mem. & Order at 5.) Accordingly,

Kaplan's claims in Civil Actions Nos. 04-10402-NMG and 05-10320-NMG relating to the election of directors are moot. See Horizon Bank & Trust Co. v. Mass., 391 F.3d 48, 53 (1st Cir. 2004). Gen. Elec. Co. v. Cathcart, 980 F.2d 927, 934 (3d Cir. 1992) (dismissing as moot claims regarding election of directors where new election of directors had taken place and relying on cases holding that "challenges to the election of directors for lapsed terms [were] moot"); Buckley v. Archer-Daniels-Midland Co., 111 F.3d 524, 526 (7th Cir. 1997) ("Even if the 1995 election were invalid because the proxy statements contained material omissions, this court has no remedy to grant [plaintiff] because the directors elected in 1995 either no longer serve as directors, or were reelected in 1996 based on new proxy statements.") (emphasis added).

Respectfully submitted,

FIRST HARTFORD CORPORATION

By its attorneys,

        /s/ Jonathan I. Handler
Jonathan I. Handler, BBO #561475
Jillian B. Hirsch, BBO #659531
DAY, BERRY & HOWARD LLP
One International Place
Boston, MA 02110
(617) 345-4600
                        -and-

John B. Nolan (admitted *pro hac vice*)
DAY, BERRY & HOWARD LLP
CityPlace I
Hartford, CT 06103
(860) 275-0100

Dated: May 12, 2006

-17-

## CERTIFICATE OF SERVICE

I, Jonathan I. Handler, hereby certify that on this 12th day of May 2006, I served a true and correct copy of the foregoing *Defendant First Hartford Corporation's Proposed Findings of Fact and Conclusions of Law* via e-mail and first class mail on Larry C. Kenna, Choate, Hall & Stewart, Two International Place, Boston, Massachusetts, 02110.

/s/ Jonathan I. Handler
Jonathan I. Handler
