UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RICHARD E. KAPLAN, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action Nos. |
| | ) | 04-10402-NMG |
| FIRST HARTFORD CORPORATION, | ) | 05-10320-NMG |
| | ) | 06-01424-NMG |
| *Defendant.* | ) | CONSOLIDATED |
| | ) | |

**DEFENDANT FIRST HARTFORD CORPORATION'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (AMENDED)**

Pursuant to the Court's order upon the close of the evidence at trial, defendant First

Hartford Corporation ("FHC") respectfully submits these Proposed Findings of Fact and

Conclusions of Law (Amended).

**I.    PROPOSED FINDINGS OF FACT**

**A.    First Hartford Corporation**

1.    FHC is a Maine corporation with its principal place of business in Manchester,

Connecticut.  (Ex. 17 at 1.)[1]

2.    FHC is engaged in the purchase, development, ownership, and management of

real estate.  (Id. at 2.)

3.    Neil Ellis is the President and a director of FHC, as well as the owner, directly or

beneficially, of approximately 43% of FHC's common stock, i.e., 1,325,387 shares.  (Ex. 2 at

11.)

4.    Stuart Greenwald is the Treasurer and Secretary and a director of FHC.  (Id. at 3.)

---

[1] References to "Ex. [number]" are to the Exhibits admitted into evidence at trial on May
15-16, 2006.

5.      David Harding is Vice President and a director of FHC.  (Id. at 3.)

6.      FHC's Board of Directors is comprised of Neil Ellis, Stuart Greenwald, and
David Harding.  (Ex. 3 at 4.)

7.      FHC's common stock is registered pursuant to Section 12(g) of the Securities
Exchange Act of 1934.  (Ex. 17 at 1.)

8.      There were approximately 3,083,241 outstanding shares of FHC common stock at
the time of filing of the most recent 10-K.  (Id. at 1.)

9.      FHC's shares are traded over the counter and not listed on any exchange.  (Id. at
6.)

10.     Richard E. Kaplan ("Kaplan"), the plaintiff in this action, is the beneficial owner
of approximately 19.1% of FHC's common stock, i.e., 591,254 shares.  (Id. at 43.)  Kaplan and
his brother, David Kaplan, share voting power over 445,535 of these shares, which are owned by
one or more trusts.  (Tr. I at 26:11-18.)  David Kaplan is the beneficial owner of an additional
56,151 shares.  (Ex. 17 at 43.)  Kaplan has never bought nor sold, nor attempted to buy or sell,
any FHC shares.  (Tr. I at 27:21-28:4.)[2]  He has never invested any money in FHC.  (Tr. I at
49:11-17.)

11.     Kaplan and the entities he represents have apparently owned their shares since at
least the 1980s.  (Tr. I at 18:25.)  Kaplan did not regularly review FHC's 10-Ks, although he
recognized that they were available to him for review.  (Tr. I at 29:14-19.)  He also had never
made a shareholder proposal with respect to FHC until the 2005 shareholder meeting, and he has
never nominated anyone to serve on FHC's board of directors.  (Tr. I at 31:12-18.)

---

[2] References to "Tr. I [pages:lines]" or "Tr. II [pages:lines]" are to the transcript from
days 1 and 2 of the trial on May 15 and May 16, 2006, respectively.

12.    Kaplan has filed an action in U.S. District Court for the District of Maine in which he is seeking dissolution of FHC or, in the alternative, to have FHC buy his shares.  (Tr. I at 50:1-5.)

13.    In 1981, FHC filed a Petition for Reorganization under Chapter 11 of the United States Bankruptcy Code.  (Ex. 16 at FHC0090.)  FHC successfully emerged from bankruptcy in 1987.  (Id.)  The interests of FHC's shareholders were unimpaired in the Chapter 11 case.  (Tr. II at 71:8-14.)  Since that time, because of uncertainty surrounding FHC's financial condition, lenders that finance the business of FHC have regularly required that Ellis, and in some instances entities owned, directly or indirectly, by Ellis and his wife, personally guarantee certain loans to FHC and its subsidiaries.  (Ex. 3 at 10.)  Indeed, FHC stated in its 1987 10-K that, since emerging from bankruptcy, its "ability to continue in the real estate business" has depended on its ability to obtain financing for its projects and operations, which in turn "is predicated upon personal guarantees" by Ellis.  (Ex. 16 at FHC0100.)  To meet this requirement of lenders, an FHC subsidiary has typically borrowed funds with Ellis providing a personal guarantee in return for a pledge of the stock of the borrowing subsidiary until such time as the loan is repaid and the guarantee is released.[3]  The three Proxy Statements at issue in this case each describe in reasonable detail multiple transactions in which Mr. Ellis provided personal guarantees for loans made for the benefit of FHC.  (See, e.g., Ex. 3 at 10-11.)  Neither Ellis nor any other guarantor received any remuneration in exchange for providing a guarantee in connection with any such loan.  (Tr. II at 101:24-103:13.)

14.    As recently as 2000, FHC's financial statements included a so-called "going concern" qualification, by which the company's independent auditor expressed its belief that

---

[3] FHC's 10-Ks and proxy statements make repeated reference to this general practice. (See, e.g., Ex. 1 at 7; Ex. 2 at 9; Ex. 18 at 30.)

certain circumstances "raise substantial doubt about its ability to continue as a going concern." (Ex. 10 at 10, 23.)

**B.**   **Specific Transactions:  Putnam Parkade and Hartford Lubbock**

15.   In May 2000, FHC needed to borrow $1.575 million to continue operations.  (Tr. I at 143:22-23.)  Putnam Parkade, Inc. ("PPI"), an FHC subsidiary, sought to obtain a loan to be secured by a second mortgage on its property in Putnam, Connecticut.  (Tr. I at 141:9-21; Ex. 1 at 8; Ex. 9.)  Because neither PPI nor FHC could obtain the loan based on their own credit or assets, the Journal Publishing Company, Inc. ("Journal Publishing"), a company owned jointly by Ellis and his wife, obtained the required funds by borrowing $1.575 million from M&T Bank ("M&T") at a rate of prime plus 1% and then lent the funds to PPI at the same rate.  (Ex. 1 at 8; Tr. I at 143:17-23.)  M&T required that Journal Publishing assign to it the promissory note issued by PPI as collateral for the loan.  (Ex. 9.)  M&T was concerned about FHC's financial status and wanted to ensure that in the event of a default, Journal Publishing would have sufficient funds to pay off the loan.  (Tr. I at 144:10-16; Tr. II at 37:18-24.)  Accordingly, M&T dictated the provisions of the note from PPI to Journal Publishing, which provide for so-called "participation payments" to Journal Publishing in the form of 95% of the cash flow from the property.  (Tr. II at 100:14-23; Ex. 9 at 1-2.)

16.   Neither Ellis nor Journal Publishing ever received any "participation payment" or any other compensation with respect to this transaction.  (Tr. II at 100:8-13.).  There was never any intention on Ellis's part or on Journal Publishing's part to do so.  (Id. at 37:13-17).  When PPI paid off the loan, the mortgage was released, the note was canceled, the debt was extinguished, and any theoretical obligation to make participation payments ended.  (Id. at 98:19-24.)  In January 2006, FHC's board formally confirmed in writing that the note had been

canceled and any theoretical claim for participation payments had been released. (See Ex. 11; Tr. I at 145:19-146:12.) FHC described the Putnam Parkade transactions in multiple public filings, including the three Proxy Statements at issue in this case, as well as the company's 10-Ks, which were filed with the SEC. (Ex. 1 at 8; Ex. 2 at 10; Ex. 3 at 11; Ex. 17 at 44; Ex. 18 at 43; Ex. 19 at 44.)

17.    In 1985, FHC borrowed approximately $4.5 million to purchase land in Lubbock, Texas for the purpose of constructing a shopping center.  The loan was obtained from Dollar Dry Dock Bank ("Dollar Dry Dock") with Ellis providing a personal guarantee.  (Tr. II at 85:2-3.) Dollar Dry Dock took a 25% ownership stake in the partnership formed for the Lubbock project. (Tr. II at 33:2-3.)  FHC defaulted on its mortgage and property tax payments; Ellis and his wife took out a mortgage on Mrs. Ellis's house for $200,000, which they loaned to the Lubbock partnership to remedy this deficiency.  (Tr. II at 85:15-21.)  Dollar Dry Dock eventually agreed to refinance its mortgage loan, but the FDIC took control of the bank and renounced that commitment.  (Tr. II at 85:25-86-6.)  The FHC entity was in default on its obligation to the FDIC, and neither it nor FHC had any ability to refinance the loan.  (Tr. II at 86:7-15.)  The FHC entity filed for Chapter 11 protection with respect to the property in August 1993.  (Tr. II at 86:18-22; Ex. 15 at 8.)  At the time, the FDIC's appraisal valued the property at $5.6 million, but FHC's debt on the property was in excess of $12 million, more than twice that sum.  (Tr. II at 87:11-15.)  Ellis and his related entities had already advanced several million dollars at this point to keep the Lubbock project alive.  (Tr. II at 88:17-21.)  On or about July 8, 1994, FHC and Ellis reached a settlement with the FDIC for a payment of $5.6 million and a note in the amount of $1.0 million.  As part of that transaction, an Ellis entity obtained the FDIC's and all but 1% of the partnership interest owned by FHC.  (Ex. 15 at 9.)  FHC retained a 1% interest so as to avoid

an enormous tax liability (which it had no ability to pay) for a "phantom" gain resulting from forgiveness of indebtedness income if the transaction had been treated as a property sale rather than the sale of a partnership interest. (Tr. I at 90:5-8.) To raise the cash to pay the FDIC and pay the expenses to close the transaction, Ellis obtained a $1 million loan from M&T Bank, guaranteed the approximately $5.1 million loan from a local bank, and arranged for property owned by his family to serve as collateral for the $1.0 million note to the FDIC. (Tr. I at 88:1-89:13.) The end result was that the property was owned by a partnership known as Hartford Lubbock L.P., with an FHC subsidiary called Parkade Center, Inc. owning a 1% interest and an Ellis entity owning a 99% interest. As a result, FHC reduced its total debt by approximately $15 million and recorded a book gain of approximately $6.2 million, $3 million of which came by way of Ellis's cancellation of FHC's debt to one of his entities. (Ex. 15 at 27.)

18.    Details of that transaction were fully disclosed in the FHC 10-K for the fiscal year ending April 30, 1995 as well as in the Proxy Statements. (Ex. 1 at 8; Ex. 2 at 10; Ex. 3 at 11; Ex. 15 at 27.)

**C.    The Proxy Statements And Shareholders' Meetings**

19.    On December 29, 2003, FHC distributed proxy materials in connection with the January 22, 2004 Annual Meeting of the Shareholders (the "January 2004 Meeting") at which the shareholders were to elect directors and act on a proposal to adopt the FHC 2003 Stock Option Plan (the "Stock Option Plan"). (Ex. 1.)

20.    At the January 2004 Meeting, the shareholders voted to: (i) elect to the Board of Directors Messrs. Ellis, Greenwald, and Harding; and (ii) adopt the Stock Option Plan. (Ex. 19 at 7.)

21.     Kaplan neither attended nor voted his shares in connection with the election of directors at the January 2004 Meeting.  (Tr. I at 19:24-20:3.)

22.     On January 26, 2005, FHC distributed proxy materials in connection with the February 24, 2005 Annual Meeting of the Shareholders (the "February 2005 Meeting") at which the shareholders were again to elect directors and act on a proposal from Kaplan requiring that 80% of the board to be independent ("Kaplan's Shareholder Proposal").  (Ex. 2.)

23.     At the February 2005 Meeting, the shareholders voted to:  (i) elect as directors once again Messrs. Ellis, Greenwald, and Harding; and (ii) reject Kaplan's Shareholder Proposal. (Ex. 17 at 6.)

24.     In October 2005, FHC distributed proxy materials in connection with the November 30, 2005 Annual Meeting of the Shareholders (the "November 2005 Meeting") at which the shareholders were again to elect directors and vote on a proposal to ratify:  the Stock Option Plan; the grant of non-qualified options to five individuals; and the grant of put options to five individuals.  (Ex. 3.)

25.     At the November 2005 Meeting, the shareholders voted to:  (i) elect Messrs. Ellis, Greenwald, and Harding as directors once again; (ii) ratify the Stock Option Plan; (iii) ratify the grant of non-qualified options; and (iv) ratify the grant of put options.

## II.     PROPOSED CONCLUSIONS OF LAW

### A.     Section 14(a) of the Securities Exchange Act

1.     Kaplan asserts claims in Civil Actions Nos. 05-10320-NMG and 06-01424-NMG arising from purported violations of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) (the "Securities Exchange Act").  Kaplan's Complaint in Civil Action No. 04-10402-NMG mistakenly asserts violations of § 14(e) of the Securities Exchange Act, which addresses tender offers.  See 15 U.S.C. § 78n(e).

2.    Section 14(a) of the Securities Exchange Act prohibits any person from soliciting proxies "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for protection of investors."  15 U.S.C. § 78n(a). The SEC subsequently promulgated Rule 14a-9, which provides as follows:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, <u>at the time and in the light of the circumstances under which it is made</u>, is <u>false or misleading</u> with respect to any <u>material fact</u>, or which omits to state any <u>material fact</u> necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9 (emphasis added).

3.    The plaintiff bears the burden of proof with respect to the elements of a 14(a) claim and must establish a violation of Section 14(a) by a preponderance of the evidence.  <u>See Tracinda Corp. v. DaimlerChrysler AG</u>, 364 F. Supp. 2d 362, 388 (D. Del. 2005).  A plaintiff establishes a violation of Section 14(a) and Rule 14a-9 by demonstrating that:  (a) the proxy statement contains a material misrepresentation or omission; (b) the defendant is chargeable with some degree of culpability or fault; and (c) the proxy caused an injury to the plaintiff (<u>i.e.</u>, the proxy was an "essential link" in the challenged transaction).  <u>See Royal Bus. Group, Inc. v. Realist, Inc.</u>, 933 F.2d 1056, 1063 (1st Cir. 1991); <u>Mendell v. Greenberg</u>, 612 F. Supp. 1543, 1548 (S.D.N.Y. 1985), <u>aff'd</u>, 927 F.2d 667 (2d Cir. 1990); <u>In re BankAmerica Corp. Sec. Litig.</u>, 78 F. Supp. 2d 976, 988-89 (E.D. Mo. 1999).

4.    A misrepresentation or omission "is material if there is a <u>substantial likelihood that a reasonable shareholder would consider it important</u>" in making an investment decision. <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976) (emphasis added); <u>New England</u>

Anti-Vivisection Soc., Inc. v. U.S. Surgical Corp., 889 F.2d 1198, 1202 (1989).  "[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact [or the absence of the misrepresentation] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (internal quotation marks and citation omitted) (emphasis added); see also Gebhardt v. ConAgra Foods, Inc., 335 F.3d 824 (8th Cir. 2003) (materiality should be judged from perspective of reasonable investor at the time of misrepresentation, not from perspective of investor looking back); Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997).

5.      Historical data made available by a company, including annual and quarterly reports, is part of the "total mix" of information available for consideration by a reasonable shareholder.  See Alizac Partners v. Rospatch Corp., 712 F. Supp. 599, 607 (W.D. Mich. 1989); see also In re KeySpan Corp. Sec. Litig., 383 F. Supp. 2d 358, 374 n.6 (E.D.N.Y. 2003) (defendant's SEC filings could be considered part of "total mix" of information available to shareholders particularly in the modern era of widespread availability of such filings in electronic form).[4]

6.      The U.S. Supreme Court has analogized the "reasonable investor" standard to a jury's application of the "reasonable man" standard in negligence cases.  TSC Indus., 426 U.S. at 450 n.12.

7.      "The trier of fact is uniquely competent to determine materiality, as that inquiry requires delicate assessments of inferences a [reasonable investor] would draw from a given set

---

[4] The applicable SEC regulations suggest that a registrant's discussion and analysis in its public filings may generally be limited to events occurring during the three-year period covered by the financial statements.  17 CFR 229.303 (instruction no. 1 to ¶ 303(a)).

of facts." In re Control Date Corp. Sec. Litig., 933 F.2d 616, 621 (8th Cir. 1991) (internal

quotation marks and citation omitted).

8.      "The purpose of section 14(a) is to provide full and fair disclosure from which

shareholders may draw their own inferences and make their decisions on how to vote." Mendell,

612 F. Supp. at 1548 (citing Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 381 (1970)).

"Therefore, proxy materials need not be perfect, but must simply convey a 'sufficiently accurate

picture so as not to mislead.'" Id. (quoting Kennecott Copper Corp. v. Curtiss-Wright Corp., 584

F.2d 1195, 1200 (2d Cir. 1978)) (emphasis added).

9.      The disclosure policy embodied in the proxy regulations is not without limit.

> Some information is of such dubious significance that insistence on its disclosure
> may accomplish more harm than good.  The potential liability for a Rule 14a-9
> violation can be great indeed, and if the standard of materiality is unnecessarily
> low, not only may the corporation and its management be subjected to liability for
> insignificant omissions or misstatements, but also management's fear of exposing
> itself to substantial liability may cause it simply to bury the shareholders in an
> avalanche of trivial information -- a result that is hardly conducive to informed
> decisionmaking.

TSC Indus., 426 U.S. at 448-49.  Likewise, "[a]lleged misrepresentations may also

present or conceal such insignificant data that, in the total mix of information, it simply

would not matter to a reasonable investor." Parnes, 122 F.3d at 547.

10.      "[C]orporations are not required to address their stockholders as if they were

children in kindergarten." New England Anti-Vivisection, 889 F.2d at 1202 (citing Richland v.

Crandall, 262 F. Supp. 538, 554 (S.D.N.Y. 1967)).  Likewise, "[c]ourts do not sit in proxy

disputes as professors of English literature engaged in an exercise of textural deconstruction."

Id. at 1203.

11.      "It is well settled that a proxy statement need not characterize disclosed

information," Mendell, 612 F. Supp. at 1550 (citing cases), "[n]or does the law require inclusion

of statements which are implicit or self-evident . . . or information as to which shareholders have access equal to that of defendants, or <u>of which shareholders should already be aware</u>." <u>Id</u>. at 1551 (citing cases) (emphasis added).

12.    In addition, a company need not disclose in its proxy statements information that it is not legally obligated to disclose.  <u>See</u> <u>Resnik v. Swartz</u>, 303 F.3d 147, 151 (2d Cir. 2002). "Disclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor.  For an omission to be actionable, the securities laws must <u>impose a duty to disclose the omitted information</u>." <u>Id</u>. at 154 (emphasis added).

13.    Moreover, a company need not include in its proxy statement information that is already <u>available to the shareholders in the public domain</u>.  <u>See, e.g.</u>, <u>Flum Partners v. Child World, Inc.</u>, 557 F. Supp. 492, 499 (S.D.N.Y. 1983) (emphasis added).

14.    To demonstrate a violation of Section 14(a), a plaintiff must prove that the proxy statement was the "essential link" in accomplishing the proposed action.  <u>See</u> <u>Virginia Bankshares, Inc. v. Sandberg</u>, 501 U.S. 1083, 1087 (1991); <u>Dominick v. Marcove</u>, 809 F. Supp. 805, 807 (D. Colo. 1992).  "[T]his essential link cannot be proven where . . . approval by the minority shares is not legally required to authorize the transaction." <u>Dominick</u>, 809 F. Supp. at 807; <u>see also</u> <u>Gorman v. Coogan</u>, No. 03-173-P-H, 2004 U.S. Dist. LEXIS 301, at *56 n.26  (D. Me. Jan. 13, 2004); <u>Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Fieldcrest Cannon, Inc.</u>, No. 93 Civ. 3580, 1993 U.S. Dist. LEXIS 10691, at *2 (S.D.N.Y. Aug. 3, 1993). Approval by the minority shares is "not legally required" where "[t]he transaction would have occurred even if the minority shareholders had known the truth and voted against the transaction." <u>Dominick</u>, 809 F. Supp. at 807; <u>see also</u> <u>Gorman</u>, 2004 U.S. Dist. LEXIS 301, at *56 n.26; <u>Amalgamated Clothing</u>, 1993 U.S. Dist. LEXIS 10691, at *2.

**B.    The Proxy Statements**

15.    Kaplan has failed to prove that there were any material misrepresentations or omissions in the proxy materials distributed in connection with the January 2004 Meeting (the "January 2004 Proxy Statement"), the February 24, 2005 Meeting (the "February 2005 Proxy Statement"), and the November 2005 Meeting (the "November 2005 Proxy Statement"). Specifically:

(a)    Kaplan has failed to prove that FHC's reference to the January 2004 Meeting as a "Special Meeting" rather than an "Annual Meeting" was material, i.e., a reasonable investor would not have viewed the minor difference in nomenclature "as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 232.

(b)    Kaplan has failed to prove that the fact that the January 2004 Proxy Statement did not mention that FHC had not held a shareholder meeting during the previous 18 years was an omission. FHC noted in the 2003 10-K, which it had filed with the SEC and sent to investors with the January 2004 Proxy Statement, that it had not held a shareholder meeting since 1986. (Ex. 18 at 5 ("The last meeting of security holders was held on February 13, 1986. The Company did not solicit proxies and the Board of Directors as previously reported were re-elected in its entirety.")) Kaplan himself acknowledged that he made no inquiry of the company regarding the status of meetings. (Tr. I at 45:4-9.) Kaplan has pointed to no requirement that FHC re-state this previously disclosed fact in the Proxy Statements. Even if he had proven this to be an omission, Kaplan failed to demonstrate that it was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 232.

(c)   Kaplan has failed to prove that the fact that the January 2004 Proxy Statement did not disclose names of shareholders known by FHC to own more than 5% of common stock was an omission.  As the evidence demonstrated, FHC did not disclose in the January 2004 proxy the names of any shareholders owning more than 5% of the company's shares (other than Ellis) because, at the time it sent the proxy materials to the printer, it was not aware of any.  (Tr. I at 61:24-62:2.)  While preparing the proxy materials, Greenwald had telephoned Kaplan to inquire if he owned more than 5% of FHC's shares.  (Tr. I at 59:21-60:19.)  For some unexplained reason, Kaplan did not respond to Greenwald's inquiry, instead directing him to "write [Kaplan] a letter."  (Tr. I at 60:18-19.)  Accordingly, Kaplan cannot now be heard to complain about any failure to list him as a 5% shareholder.  Once it became aware of the identities of the other shareholders holding in excess of 5% of FHC stock -- including Kaplan -- FHC disclosed this fact in the proxy materials for the February 2005 shareholders meeting.  (Tr. I at 62:10-14.)  Armed with this information, FHC's shareholders still voted to elect the same slate of directors that they had elected and ratify the Stock Option Plan that they had approved at the January 2004 Meeting.  The election alone demonstrates that the disclosure of the information at issue was immaterial.  Moreover, putting aside the election at the November 2005 shareholder meeting, Kaplan has not demonstrated how the failure to identify the other two shareholders owning more than 5% of FHC's common stock was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 232.

(d)   Kaplan has failed to prove that the January 2004 Proxy Statement, the February 2005 Proxy Statement, and the November 2005 Proxy Statement were misleading by stating that FHC's Board fulfills the role or performs some of the functions of an audit

committee and a compensation committee. (See Ex. 1 at 4; Ex. 2 at 4, 5; Ex. 3 at 5, 6.) In all three Proxy Statements, FHC disclosed that it did not have an audit or compensation committee. (Id.) Kaplan has adduced no evidence or pointed to any authority: (i) indicating that FHC was required to have such committees; or (ii) describing the function that would be performed by such committees. FHC also provided accurate information regarding the tasks that the Board of Directors performs. For example, three Proxy Statements at issue disclose that Neil Ellis sets his own compensation as well as that of FHC's other directors and employees. (Ex. 1 at 4; Ex. 2 at 5; Ex. 3 at 6.) This procedure is consistent with FHC's Bylaws, which provide that "if not fixed by the Board of Directors, any or all of the [compensation of the Directors, officers, and employees] may be fixed at any time by the President." (Ex. 76A at 9 (Art. VI, § 10).) Even if Kaplan had proven that the January 2004 Proxy Statement, the February 2005 Proxy Statement, and the November 2005 Proxy Statement misleadingly stated that FHC's Board serves the functions of an audit committee and a compensation committee, Kaplan has failed to prove that these purportedly misleading statements were material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 232.

(e)     Kaplan has failed to prove that the five-year performance graph in the Proxy Statements misleadingly suggests the price at which FHC shareholders could have sold their shares. Rather, the evidence shows that the graph plots the total return on an investment in FHC stock over a period of five fiscal years of FHC based upon the price at which shares of FHC stock last traded each such fiscal year. (See e.g., Ex. 1 at 5.) There was no evidence suggesting that the graph is inaccurate. Indeed, the only relevant testimony on the point came from Stuart Greenwald, who believed that the graph was required by law to be in the proxy, stated that an

outside vendor supplied it to him and that he checked to make sure the finished product was reasonable. (Tr. I at 135:15-137:11.) Moreover, the evidence suggests that a reasonable FHC shareholder would have been well aware that FHC's stock is not widely traded and not listed on any exchange and that, on any given date, a shareholder seeking to sell shares might not have been able to find a willing buyer at the desired price. Even if Kaplan had proven that the five-year performance graph was misleading, he has not proved that this was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 232.

(f)     Kaplan has failed to prove that the Proxy Statements did not disclose sufficient information about purportedly "self-dealing" transactions nor, for that matter, did Kaplan prove that any of FHC's directors obtained any personal benefit from any of the transactions at issue. First, Kaplan has not proved that FHC was required to include in its Proxy Statements any information regarding the transactions entered into by FHC beyond what appears in the proxy materials. Indeed, each of the proxies contains a significant amount of detailed information about the transactions at issue. (See Ex. 1 at 7-8; Ex. 2 at 9-10; Ex. 3 at 10-11.) Second, the relevant information concerning transactions entered into by FHC was included in the company's past filings with the SEC, which are publicly available to all shareholders. (See, e.g., Ex. 15 at 9, 25, 27; Ex. 19 at 29-30, 38; Ex. 17 at 33.) Finally, Kaplan failed to offer any evidence tending to establish that Ellis benefited in any way, material or not, from the

transactions.  Indeed, the evidence taken as a whole established that without the use of Ellis's credit, FHC could not have survived.[5]

       (i)      For example, Kaplan makes reference to a loan made by Journal Publishing Company, Inc. ("Journal Publishing"), an entity owned by a company that is itself owned by Mr. Ellis and his spouse, to Putnam Parkade, Inc. ("PPI"), an FHC subsidiary.  Kaplan alleges that Mr. Ellis received payments in exchange for guaranteeing this loan.  The evidence demonstrated that Kaplan is incorrect.  Although the note PPI executed in favor of Journal Publishing as security for the loan theoretically entitled Journal Publishing to receive 95% of the cash flow payments from the property in exchange for Ellis providing his personal guarantee, Mr. Ellis never sought nor received any such payments.  In 2004, the property was refinanced and Journal Publishing was repaid in full under the note.  In connection with the repayment of the note, the debt evidencing the note was extinguished, Ellis's theoretical right to receive cash flow payments (which, in any event, had been assigned to M&T Bank), none of which he ever received.  (See generally Proposed Findings of Fact ¶¶ 15-16.)  The details of this transaction, including the extinguishment of any theoretical claims the Ellises might have had to participation payments, were disclosed to the shareholders both in the Proxy Statements and in 10-Ks.  (See, e.g., Ex. 3 at 11; Ex. 17 at 44.)  Indeed, FHC's 2005 10-K states as follows:

> As per the 8K filed on October 27, 2004, a subsidiary of the Company, Putnam Parkade, Inc. refinanced its debts.  At that time Putnam paid off

---

[5] Kaplan has not made any credible showing of "self-dealing … or dishonesty or deceit which inures to the direct, personal benefit of the directors."  In re Teledyne Def. Contracting Derivative Litig., 849 F. Supp. 1369, 1381 (C.D. Cal. 1993)  Absent evidence of personal benefit by the directors -- which is entirely lacking here -- Kaplan's allegations of "self-dealing" cannot constitute an actionable § 14(a) claim.  Id. at 1380-81 (citing Gaines v. Haughton, 645 F. 2d 761, 779 (9th Cir. 1981) (holding that the type of director misconduct typically regulated by state law "need not be disclosed in proxy solicitations for director elections . . . .  This type of mismanagement, unadorned by self-dealing, is simply not material or otherwise within the ambit of the federal securities laws."))

> a second mortgage on the property in the amount of $1,235,000 to
> Journal Publishing. The Journal Publishing Company is owned by
> Green Manor Corporation, which is owned by Neil Ellis (President of
> the Company) and his wife. The stock pledge of Putnam Parkade was
> cancelled and Mr. Ellis does not have any claim to the assets of Putnam
> Parkade.

(Ex. 17 at 44 (item 13(a).)

Further, because Kaplan repeatedly has asserted in this litigation that Ellis was entitled to participation payments, FHC's board of directors chose to confirm formally that no such obligation existed by enacting a "Confirmation of Release of Claim and Cancellation of Promissory Note" on or about January 9, 2006. (Ex. 11.) Even if Kaplan had proven that the Proxy Statements did not contain sufficient information about transactions between Ellis and FHC, he has not proved that this alleged omission was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 232.

(ii)    Likewise, with respect to the Hartford Lubbock transaction, the undisputed evidence at trial indicated that: (a) FHC was in default on its mortgage and had no funds to meet its obligations with respect to the Lubbock property; (b) Ellis, at significant personal financial risk, financed the payoff of the amounts due; (c) FHC's 75% equity interest was converted into a 1% partnership interest to save the company from a significant tax liability that it could not absorb; (d) the transaction greatly reduced FHC's debt burden; and (e) the elements of the transaction were disclosed in sufficient detail in FHC's Proxy Statements and 10-Ks. (See, e.g., Ex. 1 at 8; Ex. 15 at 9, 27.) Thus, there was no omission or misleading disclosure with respect to this transaction.

(iii)    Kaplan has also failed to prove that there was a material omission with respect to the MIP 16A transaction between FHC and Ellis. As a result of this tax free

-17-

exchange, Ellis obtained the Scitico Gardens apartment complex (from which FHC continues to earn management fees), and FHC obtained a property that it then sold for a significant profit.

      (g)    Kaplan has failed to prove that the January 2004 Proxy Statement makes misleading statements regarding the Stock Option Plan.  The evidence has also shown that the October 2005 Proxy Statement included the information regarding the Stock Option Plan that Kaplan claims FHC should have included in its January 2004 Proxy Statement.  At the November 2005 Meeting, equipped with this information, FHC's shareholders voted overwhelmingly to ratify the Stock Option Plan.  That the shareholders cast the same votes after FHC had remedied any purported inadequacies in the proxy materials as they did before clearly demonstrates that none of the facts allegedly omitted from or misstated in the January 2004 Proxy Statement was material.  See Cohen v. Ayers, 596 F.2d 733 (7th Cir. 1979) (holding that shareholders ratification of a stock option plan following disclosure of previously undisclosed information demonstrated that the information was immaterial).  Even absent ratification, Kaplan has not proved that purported omissions about the Stock Option Plan in the January 2004 Proxy Statement are material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 232.

      (h)    Kaplan has failed to prove that the fact that the January 2004 Proxy Statement Proxy states that FHC filed all required SEC reports despite the fact that Messrs. Greenwald and Harding had apparently not filed their Form 3s was material.  In the February 2005 Proxy Statement, FHC disclosed that Messrs. Greenwald and Harding may have been late to file their Form 3s with the SEC, which disclosed (as had the January 2004 Proxy Statement) that each beneficially held no shares of FHC at that time.  Despite now knowing this fact, at both the February 2005 and November 2005 Meetings, the shareholders still voted to elect the same

slate of directors (including Messrs. Greenwald and Harding) that they had elected and to ratify

the Stock Option Plan that they had approved at the January 2004 Meeting as well as the grant of

non-qualified options and grant of put options.  This demonstrates that the disclosure of the

information at issue was not material, i.e., "would have been viewed by the reasonable investor

as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at

232.  Even absent this notification, there is no reason to believe that this omission would have

made any difference to a reasonable stockholder who would already have learned from the

January 2004 Proxy that neither Greenwald nor Harding owned any stock in the company.  (See

Ex. 1 at 9.)

      (i)      Kaplan has failed to prove that the statement in the February 2005 Proxy

Statement in opposition to Kaplan's Shareholder Proposal that "the Board of Directors acts on

behalf of the best interest of all shareholders" was misleading.  Even if Kaplan had proven the

foregoing, he has failed to prove that it was material, i.e., "would have been viewed by the

reasonable investor as having significantly altered the 'total mix' of information made

available." Id.  It is well-settled that "[g]eneral statements of optimism . . . are not actionable"

under Section 14(a).  In re Metricom Sec. Litig., No. C. 01-4085 PJH, 2004 U.S. Dist. LEXIS

7834, at *95 (N.D. Cal. Apr. 29, 2004); Guerra v. Teradyne Inc., No. 01-11789-NG, 2004 U.S.

Dist. LEXIS 28548, at *44 (D. Mass. Jan. 16, 2004).

      (j)      Kaplan has not proved that the descriptions of the directors' business

activities in the November 2005 Proxy Statement were deficient.  The November 2005 Proxy

Statement and the 10-Ks describe those activities in sufficient detail.  (Ex. 3 at 4-5 and 10-11;

Ex. 17 at 33-34, 42, 44; Ex. 18 at 22, 27, 30-31; Ex. 19 at 30, 38.)  Even if Kaplan had proven

that the descriptions of the directors' business activities were deficient, he has failed to prove that

this was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 232.

(k)    Kaplan has presented no evidence that there have ever been any director nominees other than Messrs. Ellis, Greenwald, and Harding, or that the Board of Directors would not have given consideration to other director nominees had there been any. Even if Kaplan had proven the foregoing, he has not proved that the statement in the November 2005 Proxy Statement that the Board of Directors gives regular consideration to director nominees was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id.

(l)    Kaplan has failed to prove that the summary compensation table in the November 2005 Proxy Statement is incomplete because it does not include the value of all monetary and other benefits provided by FHC to nominees. The summary compensation table sets forth the total compensation provided by FHC to Messrs. Ellis, Greenwald, and Harding. Kaplan has put forth no evidence that FHC was required to disclosure any additional information regarding the directors' compensation or, for that matter, that any of the directors received any other benefits, monetary or otherwise. Even if Kaplan had proven that the summary compensation table was incomplete, he has not proved that this fact was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 232.

(m)    Kaplan has failed to prove that Mr. Ellis and his companies have frequently borrowed from FHC. On the contrary, the evidence overwhelmingly demonstrates that Mr. Ellis, directly and through entities owned by him and his wife, undertook repeated personal financial risks to assist FHC during periods when the company could not borrow money

on its own or lacked liquidity. (See generally Proposed Findings of Fact ¶ 13.) The undisputed testimony reflected that Mr. Ellis was always a net lender to FHC. (Tr. II at 48:18-24.) FHC's shareholders, and Kaplan in particular, greatly benefited from Mr. Ellis's actions. Moreover, FHC made repeated, detailed disclosures in both its proxies and 10-Ks regarding the flow of funds to and from the Ellis entities. (See, e.g., Ex. 15 at 37; Ex. 16 at FHC 0114, 0116.) Even if Kaplan had proven that FHC insufficiently disclosed these transactions, he has not proved that this alleged omission was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 232.

(n)      Kaplan has failed to prove that FHC made loans or extended credit to its directors. Other than the transactions involving Mr. Ellis, which have been addressed elsewhere and were well-documented, there was no evidence at trial that FHC extended any credit or loans to its directors. Even if Kaplan had proven that FHC did not disclose such transactions, he has not proved that any failure to disclose such was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id.

(o)      Kaplan has failed to prove that the November 2005 Proxy Statement does not disclose business relationships other than Hartford Lubbock, and with respect to Hartford Lubbock does not disclose how Journal Publishing came to own a 99% limited partnership interest and FHC a 1% general partnership interest in Hartford Lubbock L.P. There is no evidence that FHC was required to disclose any additional information about its business relationships or how Journal Publishing came to own a 99% limited partnership interest and FHC a 1% general partnership interest in Hartford Lubbock L.P. in 1994 beyond the multiple

-21-

disclosures to be found in the proxies and the 10-Ks. For example, in all three Proxy Statements, FHC stated that Hartford Lubbock L.P. is "a limited partnership of which Journal Publishing Company, Inc. owns a 99% limited partnership interest and [FHC] owns a 1% general partnership interest." (See Ex. 1 at 8; Ex. 2 at 10; Ex. 3 at 11; see generally Proposed Findings of Fact ¶ 17.)[6] Even if Kaplan had proven that the November 2005 Proxy Statement contained the foregoing alleged omission, he has not proved that this alleged omission was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 232.[7]

(p)    The three Proxy Statements at issue all state as follows with respect to Harding and Richmond Realty LLC:

> [Harding] was the President of Richmond Realty, LLC, a real
> estate management company, from January 1996 to January 2003.
> In the past, Richmond Realty managed certain properties of First
> Hartford, but currently it only manages property of others.

(Ex. 3 at 4.) Kaplan introduced no evidence at trial to prove that this statement was in any way inaccurate. Moreover, it is hard to imagine how, even if this statement were incorrect, it could be material, given the undisputed evidence that Harding obtained no personal benefit from Richmond Realty (Tr. I at 27:23-24:18) and that, as Kaplan's counsel admitted, to the contrary,

---

[6] Moreover, under Texas law, a limited partner can become what is essentially a "de facto" general partner by participating in the conduct of the business of the partnership. See Tex. Rev. Civ. Stat. art. 6132a-1, sec. 3.03(a).

[7] Many of Kaplan's claims are so stale as to be subject to a laches defense were he trying to have the transactions at issue set aside. See Federal Home Loan Bank Bd. v. Elliott, 386 F.2d 42, 54 (9th Cir. 1967) (quoting 13 Fletcher Cyclopedia Corporations (Perm. Ed.) § 5874, page 279.) Three elements are required to prove laches: (1) full knowledge of the facts; (2) unreasonable delay in assertion of a remedy; and (3) intervening prejudice to another. Id. All three factors are present here, where the transactions of which Kaplan complains occurred five and ten years ago.

"Richmond Realty really exists only for the benefit of First Hartford Corporation." (Tr. I. at 12:10-11; see also Tr. I at 118:12-14.)

(q)    The SEC requires that a registrant "describe briefly any transaction … since the beginning of the registrant's last fiscal year" to which the registrant or any of its subsidiaries was or is to be a party, in which the amount involved exceeds $60,000 and in which any of the following persons had . . . a direct or indirect material interest . . . .":

(i)    Any director or executive officer of the corporation;

(ii)   Any nominee for election as a director;

(iii)  Any holder of more than 5% of the company's securities; and

(iv)   Any immediate family member of the persons listed in (i) through (iii).

17 C.F.R. § 229.404(a) (emphasis added).  Despite his allegations, made on the eve of trial, Kaplan has failed to prove that FHC violated this regulation by not disclosing that Hartford Lubbock II L.P., a partnership that is 99% owned by Journal Publishing, made payments to Ellis's adult daughters or son-in-law in amounts that did not meet the regulatory threshold.  The payments in question totaled $60,000 per year.  As Kaplan admitted in his complaint, Journal Publishing owned 99% of the Lubbock entity.  FHC's interest in cash flow was limited to 1%.  $600 per year is not material.

(r)    The SEC also requires a registrant to describe in its 10-K certain business relationships involving its directors that "exist, or have existed during the registrant's last fiscal year."  17 C.F.R. § 229.404(b).  Those relationships include the following:

(i)    If the director owns of record or beneficially in excess of ten percent equity interest in any business or professional entity that has made during the registrant's last full fiscal year payments to the registrant or its subsidiaries for property or services in excess of five percent of (1) the registrant's consolidated gross revenues for its last full fiscal year, or (2) other entity's consolidated gross revenues for its last full fiscal year.

-23-

(ii)     If the director owns of record or beneficially in excess of ten percent equity interest in any business or professional entity to which the registrant or its subsidiaries has made during the registrant's last full fiscal year payments to the registrant or its subsidiaries for property or services in excess of five percent of (1) the registrant's consolidated gross revenues for its last full fiscal year, or (2) other entity's consolidated gross revenues for its last full fiscal year.

(iii)     If the director owns of record or beneficially in excess of ten percent equity interest in any business or professional entity to which the registrant or its subsidiaries was indebted at the end of the registrant's last full fiscal year in an aggregate amount in excess of five percent of the registrant's total consolidated assets at the end of such fiscal year.

Kaplan has likewise failed to prove that FHC violated this regulation either.

(s)     Kaplan has failed to prove that the November 2005 Proxy Statement misleadingly states that "provisions have been included to meet the requirements for deductibility of executive compensation for the purposes of Section 162(m) of the Internal Revenue Code." (Ex. 3 at 14.)  Kaplan introduced no evidence at all on this point at trial. Moreover, this statement is not misleading.  FHC did not state or even suggest that options had been granted under the plan that meet the requirements for deductibility.  Rather, a reasonable shareholder would have understood this statement to mean that provisions had been put in place to address any such grants if they were to be made.  Even if Kaplan had proven that this statement in the November 2005 Proxy Statement was misleading, he has not proved that this alleged misleading statement was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  Basic, 485 U.S. at 232.

(t)     Kaplan has failed to prove that the November 2005 Proxy Statement does not disclose that Mr. Ellis determined the terms and conditions of each award under the Stock Option Plan.  Kaplan has put forth no evidence that Mr. Ellis determined the terms and conditions of each award under the Stock Option Plan.  The minutes of the Board of Directors meeting of February 11, 2004 state that the Board approved the grant of options to five

-24-

employees. (Ex. 6 at FHC0035-37.) Kaplan offered no evidence that the description in the minutes (accurately included in the November 2005 Proxy Statement) was incorrect in any way. Even if Kaplan had so proven, he has not proved that this alleged misrepresentation was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 232.

       (u)    Kaplan has failed to prove that the November 2005 Proxy Statement does not disclose that FHC approved a grant of "put options." In fact, the November 2005 Proxy Statement states FHC's Board of Directors had approved the grant of certain put options to each of the employees who received a grant of non-qualified stock options. (Ex. 3 at 8 n. 4.) Kaplan also complains that this information should have been disclosed in the January 2004 Proxy Statement, but the undisputed documentary and testimonial evidence at trial was that FHC's board of directors did not act on the "put options" proposal until February 11, 2004, i.e., after the January 2004 shareholder meeting.[8] (Ex. 6; Tr. II at 13:19-23, 83:16-20, 137:25-138:11.) There was also evidence that the put options were designed to reward longtime, loyal FHC employees who had worked for many years at discounted salaries because of the company's precarious financial situation. (Tr. I at 139:12-140:18.) Even if Kaplan had proven an omission with respect to the put options, he has not proved that this was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 232.

       (v)    Kaplan has failed to prove that the November 2005 Proxy Statement misleadingly suggests that pursuant to the Stock Option Plan non-qualified stock options and put options were granted separately when actually each of the participants received a single grant

---

[8] This was the same date that the board of directors authorized the issuance of stock options per the January 22, 2004 shareholders meeting. (Ex. 6 at 1.)

comprised of non-qualified stock options and put options. Kaplan failed to introduce any evidence on this on this point at trial. Even if Kaplan had proven such a misrepresentation, he has not proved that this was material, i.e., "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id.

16.     Even if Kaplan had proven a violation of 14(a) with respect to any of the Proxy Statements -- and he has not -- as this Court stated in its April 5, 2006 Memorandum and Order on First Hartford Corporation's Motion for Summary Judgment, "much of the relief initially sought by plaintiff would be pointless if awarded now (e.g., a revocation of the annual election of defendant's directors for 2004-05)." (Apr. 5, 2005 Mem. & Order at 5.) Accordingly, Kaplan's claims in Civil Actions Nos. 04-10402-NMG and 05-10320-NMG relating to the election of directors are moot. See Horizon Bank & Trust Co. v. Mass., 391 F.3d 48, 53 (1st Cir. 2004). Gen. Elec. Co. v. Cathcart, 980 F.2d 927, 934 (3d Cir. 1992) (dismissing as moot claims regarding election of directors where new election of directors had taken place and relying on cases holding that "challenges to the election of directors for lapsed terms [were] moot"); Buckley v. Archer-Daniels-Midland Co., 111 F.3d 524, 526 (7th Cir. 1997) ("Even if the 1995 election were invalid because the proxy statements contained material omissions, this court has no remedy to grant [plaintiff] because the directors elected in 1995 either no longer serve as directors, or were reelected in 1996 based on new proxy statements.") (emphasis added).

Respectfully submitted,

FIRST HARTFORD CORPORATION

By its attorneys,

_____ /s/ Jonathan I. Handler _____
Jonathan I. Handler, BBO #561475
Jillian B. Hirsch, BBO #659531
DAY, BERRY & HOWARD LLP
One International Place
Boston, MA 02110
(617) 345-4600
                              -and-

John B. Nolan (admitted *pro hac vice*)
DAY, BERRY & HOWARD LLP
CityPlace I
Hartford, CT 06103
(860) 275-0100

Dated: May 23, 2006

## CERTIFICATE OF SERVICE

I, Jonathan I. Handler, hereby certify that on this 23rd day of May 2006, I served a true and correct copy of the foregoing ***First Hartford Corporation's Proposed Findings of Fact and Conclusions of Law (Amended)*** via e-mail and first class mail on Larry C. Kenna, Choate, Hall & Stewart, Two International Place, Boston, Massachusetts, 02110.

     /s/ Jonathan I. Handler     
Jonathan I. Handler
