# Exhibit 11

Kaplan v. First Hartford

3/21/2005                                                          Stuart Green

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------

RICHARD E. KAPLAN,                    )
            Plaintiff,                )
                                      )
        vs                            )
                                      )
FIRST HARTFORD CORPORATION,           )  04-10402-NMG
            Defendant.                )
------------------------------

--------------------------------------------------------
            Deposition of: STUART I. GREENWALD
--------------------------------------------------------

    Taken before Tina M. Davis, Stenographer and
Notary Public in and for the State of Connecticut,
pursuant to notice, at the offices
of ROBINSON & COLE, 280 Trumbull Street, Hartford,
Connecticut, on Monday, March 21, 2005 scheduled to
commence at approximately 10:00 a.m.

                Tina M. Davis, LSR
                License No. 00221
        Brandon Smith Reporting Service
                44 Capitol Avenue
               Hartford, CT  06106
                (860) 549-1850


857c1d0e-e761-4b76-b4f4-be3c6ca4c1b3

Kaplan v. First Hartford

Stuart Green

1   First Hartford Corporation and the

2   Hartford Lubbock Shopping Center?

3      A.  The basic terms are a 4 percent management fee.

4      Q.  Who pays that?

5      A.  Hartford Lubbock.

6      Q.  What is Hartford Lubbock, as you referred to it?

7   What is it?

8      A.  Well, it's the Hartford Lubbock, Limited

9   Partnership.

10     Q.  Have you seen a partnership agreement relating to

11  the Hartford Lubbock, Limited Partnership?

12     A.  Yes.

13     Q.  So you know that exists?

14     A.  Yes, it does.

15     Q.  Who are the partners?

16          MR. NOLAN:  Why does that make any

17  difference?  I'm going to instruct him not to answer.

18  That does not have anything to do with this litigation.

19  You know Mr. Ellis is.

20          MR. KENNA:  We've got statements made in the

21  proxy materials about the Hartford Lubbock, LP, Limited

22  Partnership in which Journal Publishing Company, Inc.

23  owns 99 percent of the property.  I am asking questions

24  relating to that.

25          MR. NOLAN:  What's the question?

Brandon Smith Reporting

Kaplan v. First Hartford

3/21/2005                                                    Stuart Green

Page 135

1              MR. KENNA:  I asked who were the partners of

2     the limited partnership.

3              MR. NOLAN:  You know that.

4              MR. KENNA:  I haven't seen the partnership

5     agreement.  It should have been produced to us.

6              MR. NOLAN:  I don't think so.

7              MR. KENNA:  Oh, absolutely.

8              MR. NOLAN:  Under what theory?

9              MR. KENNA:  Absolutely.

10             MR. NOLAN:  Under what theory?

11             MR. KENNA:  Because we asked for documents

12    relating to the transaction.

13             MR. NOLAN:  You didn't ask Hartford Lubbock

14    for any documents.

15             MR. KENNA:  I asked if they have a copy of

16    the partnership agreement.

17             MR. NOLAN:  No, no.  Don't say they.  You're

18    pointing again, and it's really unpleasant.  It's not a

19    nice thing to do.

20             MR. KENNA:  I asked him if he's seen a

21    document.  He knows it exists.

22             MR. NOLAN:  So what?

23             MR. KENNA:  Well --

24             MR. NOLAN:  This is a deposition --

25             MR. KENNA:  Is it in --

Brandon Smith Reporting

Kaplan v. First Hartford

Page 136

1           MR. NOLAN:  Let me finish my statement.

2    This is a deposition of the First Hartford Corporation.

3    That is not a document that the

4    First Hartford Corporation has or is within its power.

5    The fact that this gentleman may have seen it is beside

6    the point.  You haven't established that First Hartford,

7    A, has a copy of it.

8    BY MR. KENNA:

9       Q.  Does it?

10      A.  A copy exists.

11      Q.  And you have it; right?

12          MR. NOLAN:  Not you.  First Hartford

13   Corporation.

14          MR. KENNA:  I mean First Hartford

15   Corporation.

16      A.  A copy exists in our office.

17          MR. KENNA:  It exists in the office of

18   First Hartford Corporation.

19          MR. NOLAN:  So what?  That is also the

20   office of a lot of other entities.

21          MR. KENNA:  Well, possession, custody, or

22   control.

23   BY MR. KENNA:

24      Q.  You could get a copy of that partnership

25   agreement --

Brandon Smith Reporting

Kaplan v. First Hartford

3/21/2005                                                    Stuart Green

Page 137

1     A.   Absolutely.

2     Q.   -- couldn't you, Mr. Greenwald?

3     A.   Absolutely.

4     Q.   And you could produce it for us?

5     A.   Yes, I could.

6     Q.   Is it correct, as far as you know, that

7  Hartford Lubbock is a limited partnership of which

8  Journal Publishing Company, Inc. owns 99 percent of the

9  partnership interest?

10    A.   It owns 99 percent of a partnership.  It's set up

11 between two corporations.  In effect, they own 98 and a

12 fraction percent.

13    Q.   What's the name of the other corporation?

14           MR. NOLAN:   Unless it's

15 First Hartford Corporation, don't answer the question.

16    A.   I'm not sure who the general partner is.

17 BY MR. KENNA:

18    Q.   Let me go back to Exhibit 2, the proxy materials.

19    A.   Okay.

20    Q.   Page 8 again.  Now, the second paragraph at the

21 top of page 8 on the proxy materials starts out,

22 "Several loans which were obtained by Mr. and Mrs. Ellis

23 for the benefit of First Hartford are to be repaid by

24 First Hartford.  These loans do not require interest

25 payments."  Did I read that correct ly?

Kaplan v. First Hartford

3/21/2005                                                    Stuart Green

Page 155

    1        A.    No.

    2        Q.    All right.

    3              MR. KENNA:    Why don't we take a couple

    4     minutes.

    5

    6                    (A brief recess was taken

    7                    from 2:59 p.m. to 3:05 p.m.)

    8

    9                    DIRECT EXAMINATION (cont.)

   10

   11     BY MR. KENNA:

   12        Q.    Let's look at Exhibit 13.    Now, Exhibit 13 is the

   13     proxy materials relating to the meeting of the

   14     shareholders that was held on February 24, 2005;

   15     correct?

   16        A.    Yes.

   17        Q.    I'm looking for a specific section of this that

   18     talks about loans before 2001.    It's on page -- do you

   19     notice up on the top on the right-hand corner it has

   20     page blank of blank.    It will be 22 of 33.

   21        A.    Uh-huh.

   22        Q.    Do you have that?

   23        A.    Yes.

   24        Q.    Down toward the middle of the paragraph it says,

   25     "Prior to 2001 several additional loans were obtained by

857c1d0e-e761-4b76-b4f4-be3c6ca4c1b3

Kaplan v. First Hartford

3/21/2005                                                    Stuart Green

Page 156

1    Journal Publishing Company, Inc., a corporation that is

2    wholly owned by Mr. Ellis and his wife, for the benefit

3    of First Hartford and are to be repaid by

4    First Hartford."

5        A.   Where -- oh, the second full paragraph?

6        Q.   Yes.

7        A.   Oh, I'm sorry.

8        Q.   "These loans do not require interest payments.

9    The current balance of these loans as of

10   December 31, 2004 was $1,156,177."

11            Does First Hartford Corporation have any

12   documentation of the loans that are referred to in this

13   paragraph?

14            MR. NOLAN:  Well, this is the 2000 --

15            MR. KENNA:  Right.  But we're talking about

16   prior to 2001.

17            MR. NOLAN:  So what?

18            MR. KENNA:  Well, it's relevant.

19            MR. NOLAN:  I don't see it as relevant.

20            MR. KENNA:  It's absolutely --

21            MR. NOLAN:  No.  What does it have to do

22   with your complaint?

23            MR. KENNA:  It has everything to do with my

24   complaint, because it's in the same time period.

25            MR. NOLAN:  What's in the same time period?

Kaplan v. First Hartford

3/21/2005                                                    Stuart Green

---

Page 157

1              MR. KENNA:  It says, "Prior to 2001 several

2      additional loans."  That's what I'm talking about.

3              MR. NOLAN:  Is this any different than what

4      you just spent 15 minutes talking about?

5              MR. KENNA:  Well, I'm trying to find out.

6              MR. NOLAN:  Why don't you ask him that?

7              MR. KENNA:  I'm trying to find out.  That's

8      what I'm asking him.

9              MR. NOLAN:  You can answer that question.

10     A.  They're talking about the same loans.

11     BY MR. KENNA:

12     Q.  The same loans I asked you about previously --

13     A.  Correct.

14     Q.  -- in connection with the proxy materials for the

15     2004 shareholders meeting?

16     A.  Correct.

17     Q.  All right.  Is your answer the same, there's no

18     documentation in terms of promissory notes relating to

19     these loans?

20             MR. NOLAN:  Come on.

21     BY MR. KENNA:

22     Q.  Is there or isn't there?

23     A.  My answer would be the same as before.  We did

24     not find any promissory notes.

25     Q.  As it goes on down further it talks about -- it

---

Brandon Smith Reporting

857c1d0e-e761-4b76-b4f4-be3c6ca4c1b3

Kaplan v. First Hartford

3/21/2005                                                        Stuart Green

Page 158

1    mentions Hartford Lubbock, LP, limited partnership.

2       A.   Uh-huh.

3       Q.   Journal Publishing Company owns 99 percent of the

4    partnership interest in that --

5       A.   That's what it says.

6       Q.   "For management fees incurred during fiscal years

7    2002 and 2003."  Are there any management fee contracts

8    that you're aware of relating to management fees that

9    were incurred?

10      A.   You asked that question before.

11            MR. NOLAN:  You've already asked this

12   question.  Now you're trying to do discovery on your

13   next lawsuit.

14            MR. KENNA:  No, I'm not.  I'm not.  This is

15   relating to the same period of time.  It should have

16   been --

17            MR. NOLAN:  You've already asked him the

18   question, Mr. Kenna.  You asked him if there was a

19   written management agreement, and

20            MR. KENNA:  This material --

21            MR. NOLAN:  Let me finish.

22            That was about ten minutes ago.  It didn't

23   materialize.  You didn't limit your question just to the

24   prior proxy statement.  Proxy statements and material.

25   Either there was an agreement or there isn't.  You asked

857c1d0e-e761-4b76-b4f4-be3c6ca4c1b3

Kaplan v. First Hartford

3/21/2005                                                      Stuart Green

---

Page 159

1    him if there was, he said there wasn't.  Let's move on.

2    You can't keep asking him the same questions.

3              MR. KENNA:  I'm asking whether you have

4    documentation of the management fee contracts that are

5    specifically referred to here.

6              MR. NOLAN:  You're talking about Exhibit 13.

7              MR. KENNA:  Yes, Exhibit 13.

8              MR. NOLAN:  He's not going to answer that

9    question.  If you want to ask him about the prior proxy

10   statement, ask him again.  He's not answering anymore

11   questions about Exhibit 13.

12             MR. KENNA:  Listen.  This says, "Management

13   fees incurred during fiscal years 2002 and 2003."

14             MR. NOLAN:  I understand.

15             MR. KENNA:  It's my contention that this

16   information should have been included in the prior proxy

17   materials.

18             MR. NOLAN:   It was.  You just spent

19   20 minutes asking him questions about that.

20             MR. KENNA:  No.

21             MR. NOLAN:  Yes.

22             MR. KENNA:  No.  I think this is a little

23   bit different.

24             MR. NOLAN:  I don't think so.

25             MR. KENNA:  I think it's a little bit

Brandon Smith Reporting

857c1d0e-e761-4b76-b4f4-be3c6ca4c1b3

Kaplan v. First Hartford

3/21/2005                                                          Stuart Green

Page 160

1    different.

2              MR. NOLAN:  I don't think so.  We're not

3    going to be talking about this proxy statement.

4        A.  Same thing.

5    BY MR. KENNA:

6        Q.  Same thing?  You do have management contracts; is

7    that correct?

8        A.  I didn't say that before.  Why would you --

9              MR. NOLAN:  He didn't say that.

10   BY MR. KENNA:

11       Q.  Do you or don't you?

12       A.  I told you before I don't know.

13       Q.  You don't know?

14       A.  I don't know.

15       Q.  All right.  What about the $670,000 owed to

16   First Hartford by MP16A Corporation?

17       A.  Okay.  MP --

18             MR. NOLAN:  Wait a minute.  That's not a

19   question, so I object to it.

20   BY MR. KENNA:

21       Q.  Do you have documentation, does the company have

22   documentation relating to that transaction, $670,000

23   owed to First Hartford by MP16a corporation?

24       A.  That is a typo, first of all.  It should be

25   MIP16A Corp.  That's the company that holds

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


*******************************
RICHARD E. KAPLAN,                *
    Plaintiff,                    *
                                  *
v.                                * Civil Action No.
                                  * 04-10402-NMG
                                  *
FIRST HARTFORD CORPORATION,       *
    Defendant.                    *
*******************************
RICHARD E. KAPLAN,                *
    Plaintiff,                    *
                                  *
v.                                * Civil Action No.
                                  * 05-10320-NMG
                                  *
FIRST HARTFORD CORPORATION,       *
    Defendant.                    *
*******************************


               DEPOSITION OF STUART I. GREENWALD,
taken pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before Michelle
Kaczynski, a Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Day, Berry & Howard
LLP, One International Place, 17th Floor, Boston,
Massachusetts, on Thursday, February 9, 2006, at 2:49
p.m.


**KACZYNSKI REPORTING**
**72 CHANDLER STREET, SUITE 3**
**BOSTON, MASSACHUSETTS  02116**
**(617) 426-6060**

1    Q.    -- some statements about being turned down

2    because, with NASDAQ because of litigation by the

3    Kaplan family?

4    A.    Correct.

5    Q.    Do you recall that?

6    A.    Yes.

7    Q.    And do you recall Mr. Ellis directing

8    comments in the direction of Mr. Rothberg and the

9    Kaplans at that meeting that the company would be

10    reserving all their rights for damages with respect to

11    that?

12    A.    Correct.

13    Q.    I'm going to ask you to just jump a little

14    bit out of order, but I hope you'll bear with me.

15    Exhibit 23, which is the Form 10-K for First Hartford

16    Corporation for the fiscal year ended April 30, 2005,

17    ask you just to take a look at that document.  What was

18    the exhibit again, 23?

19    A.    Correct.

20    Q.    Do you recognize that document, sir, as the

21    10-K for First Hartford Corporation for the fiscal year

22    ended April 30 of 2005?

23    MR. NOLAN:  Are you representing that

24    it's something that someone in your office pulled off

KACZYNSKI REPORTING

68

1    the EDGAR computer --

2                   MR. KENNA:  Probably, yes.

3         Q.   What's the date on the bottom of yours?

4         A.   8/25/05.

5         Q.   8/25/05, that's the one I have too.

6                   MR. NOLAN:  So yes, this is your

7    document, right?

8                   MR. KENNA:  That's right.

9                   MR. NOLAN:  Okay, so as long as you're

10   vouching for it --

11                  MR. KENNA:  Yes, once we got to the

12   point of --

13                  MR. NOLAN:  -- take your representation.

14                  MR. KENNA:  Okay.  Well, I'm asking him,

15   I wanted him to look at it though because, you know --

16                  MR. NOLAN:  Well --

17                  MR. KENNA:  And I will point out that if

18   you really, you know, look hard at this thing and

19   really go over to the margins of a couple of these

20   pages on the right hand side, there might be some

21   numbers that, you know, didn't get printed out, but --

22                  MR. NOLAN:  Well, I mean, just flipping

23   through this, yes, yes --

24                  MR. KENNA:  Basically is that the --

KACZYNSKI REPORTING

1           MR. NOLAN:  Just a minute.  We're not

2      making an issue out of the copying job, right?

3           MR. KENNA:  All right.

4           MR. NOLAN:  Are we?

5           MR. KENNA:  I hope not.  I want to know

6      if his, if he recognizes this as the Form 10-K --

7           MR. NOLAN:  For what --

8           MR. KENNA:  -- First Hartford

9      Corporation, fiscal year ended April 30, 2005.

10          MR. NOLAN:  It's a hundred and nine

11     pages long.  I don't think it's fair for you to ask him

12     whether it's entirely accurate.  If it's something that

13     was prepared by your office and you say it's what was

14     on the --

15          MR. KENNA:  We didn't prepare it, sir.

16          MR. NOLAN:  I understand, but you

17     printed it off, and I don't know what the operator of

18     your computer did or didn't do, and as long as you're

19     telling us that that's what you think it is, we can,

20     you can ask questions about it, but I don't, you

21     know --

22          MR. KENNA:  I'm asking Mr. Greenwald,

23     okay, as the --

24          MR. NOLAN:  -- all right, then I'm going

1    to object to it.

2                    MR. KENNA:  You can object; as the

3    designee of First Hartford Corporation to respond to

4    the notice of deposition and the matters for

5    examination that includes this document, I believe --

6                    MR. NOLAN:  And the question is is this

7    an accurate copy of the First Hartford 10-K?

8         Q.    I'm asking if you recognize this document as

9    the Form 10-K of First Hartford Corporation for fiscal

10   year ended April 30 of 2005?

11                   MR. NOLAN:  Mr. Greenwald, look at

12   page nine, please.

13                   THE WITNESS:  I saw that, it's cut

14   off --

15                   MR. NOLAN:  Would you look at page --

16                   THE WITNESS:  Yes, it's cut off the

17   numbers --

18                   MR. NOLAN:  Look at it right now, it's

19   cut off.

20                   THE WITNESS:  Yes.

21                   MR. NOLAN:  Did you file when you

22   filed --

23                   MR. KENNA:  Wait, wait, but --

24                   MR. NOLAN:  Just a minute.  When you

1    filed --

2                    MR. KENNA:  Look, look, look, no, Mr.

3    Nolan --

4                    MR. NOLAN:  No, Mr. Kenna --

5                    MR. KENNA:  No, Mr. Nolan --

6                    MR. NOLAN:  You don't want to act

7    reasonably, we will, we will take you up on it --

8                    MR. KENNA:  No, no, no, this is not me

9    acting unreasonably --

10                    MR. NOLAN:  It is.

11                    MR. KENNA:  -- this is you --

12                    MR. NOLAN:  It is.

13                    MR. KENNA:  -- jumping into this

14    deposition --

15                    MR. NOLAN:  No, no, it's not --

16                    MR. KENNA:  Mr. Greenwald is perfectly

17    qualified to stand up for himself and to answer these

18    questions.  You can object, you can draw his attention

19    to anything you want to after I conclude my

20    questioning --

21                    MR. NOLAN:  Okay.  We are now going to

22    take a break, and Mr. Greenwald is going to look at

23    every single page --

24                    MR. KENNA:  That's fine with me.

1          MR. NOLAN:  And every single page --

2          MR. KENNA:  If you think he needs to do

3     that --

4          MR. NOLAN:  And every single page that's

5     got a cutoff or anything else, if that's the way you

6     want to do --

7          MR. KENNA:  Fine, that's fine.

8          MR. NOLAN:  Is that the way you want to

9     do business?

10          MR. KENNA:  No, because I don't think we

11     need to do business that way --

12          MR. NOLAN:  Then why won't you say --

13          MR. KENNA:  Sounds like it's the way you

14     want to do business.

15          MR. NOLAN:  No, why don't you say what

16     the document is --

17          MR. KENNA:  Why don't you let your

18     witness, why don't you let him take a look at it,

19     satisfy yourself, I'll be back in a minute, and then

20     we'll --

21          MR. NOLAN:  What are we -- no, wait a

22     minute.  What are we supposed to satisfy ourself as to?

23          MR. KENNA:  I want an answer to my

24     question --

1                    MR. NOLAN:  Your question --

2                    MR. KENNA:  -- and if he can't answer

3       it, then he doesn't have to answer it, all right?

4                    MR. NOLAN:  Well, he can answer it right

5       now, you don't have to leave.  The answer is no, it's

6       not.

7                    (Short break taken).

8                    MR. KENNA:  Are we calling the judge or

9       are we going to go ahead?

10                   MR. NOLAN:  No, answer your question.

11      Q.    Sir?

12      A.    With numbers cut off in there I can't attest

13      to the reliability of this document.  A specific

14      question you want to ask, you may ask.

15      Q.    For example, can you give me an example of a

16      number that's cut off that you're having a problem

17      with?

18      A.    Well, in the --

19                   MR. NOLAN:  Answer the question.  The

20      question was whether --

21                   MR. KENNA:  That's another question now,

22      this is another question.

23                   THE WITNESS:  Okay.

24                   MR. KENNA:  I will have more after this

1      one.

2          A.    Okay, and the balance sheet, which is a

3      comparative document --

4          Q.    Which page are you looking at, sir?

5          A.    C 34 and 35.

6          Q.    Go up to the top right hand corner where it

7      says page blank of blank.

8          A.    34 of 109.

9          Q.    34 of 109?

10         A.    Correct.

11         Q.    Thank you, and what's the problem with that

12     page?

13         A.    The 2004 comparative is missing, the entire

14     column is missing.

15         Q.    Okay.

16         A.    It's missing on the next page.

17              MR. NOLAN:   There's no question pending.

18         Q.    Does the, does what is on that, what's on

19     that page, 34 of 109, where it's headed at the top,

20     First Hartford Corporation and subsidiaries

21     consolidated balance sheets, April 30, 2005 and 2004,

22     and then it has assets and it has the 2005 column, is

23     that accurate?

24         A.    It's only the 2005 column, correct.

1      Q.    Right.  Does the 2005 column and the numbers

2  that appear in that column relate to First Hartford

3  Corporation and its subsidiaries?

4      A.    I would, I would think so, but I obviously

5  haven't compared it, conformed it to anything.

6      Q.    Okay.  What else, what other problems did you

7  have --

8                MR. NOLAN:  We're not going to play that

9  game, we're not going to play this game, Mr. Kenna.

10  You have had --

11                MR. KENNA:  I'm trying to find out what

12  the problems are --

13                MR. NOLAN:  -- I know, I know for a

14  fact, I know for a fact that you have the original

15  printed copies of the proxy statements.

16                MR. KENNA:  This is what we have today,

17  this is what I'm dealing with --

18                MR. NOLAN:  And you prepared it, and you

19  want to play a game with it, that's fine.  It is not an

20  accurate document, and you want to ask him a specific

21  question, ask away and we'll see --

22                MR. KENNA:  We can find out what's not

23  accurate about it.

24                MR. NOLAN:  I don't think that that

1    serves any useful purpose.

2              MR. KENNA:  Maybe you don't, but it's

3    because you raised it, all right?

4              MR. NOLAN:  No, I didn't raise it, you

5    raised it.  You walked in here with a document that you

6    admit is inaccurate.

7              MR. KENNA:  I do not admit anything

8    about its accuracy or inaccuracy, I'm asking this

9    gentleman --

10              MR. NOLAN:  You printed it.

11              MR. KENNA:  I'm asking this gentleman,

12    he's the one who's on, who's being deposed, he's the

13    one that First Hartford Corporation put up and said,

14    Mr. Greenwald is the person who has, is going to

15    testify on behalf of the corporation with respect to

16    these documents, including FHC's Form 10-K for fiscal

17    year ended April 30, 2005, right --

18              MR. NOLAN:  Right, that's exactly

19    correct, and we've now established that this a document

20    prepared by Choate, Hall & Stewart.

21              MR. KENNA:  This document was not

22    prepared by Choate, Hall & Stewart.

23              MR. NOLAN:  It was printed by them, you

24    brought it in here, you chose not to --

1          MR. KENNA:  Let me ask him, I'm going to

2    ask him questions about this document.

3          Q.   And I think we've covered a lot of this

4    before with other, with prior or other 10-K's that were

5    submitted by First Hartford Corporation.  Now, back at

6    the time of, in December of 2004 and the year 2003, who

7    were the accountants for First Hartford Corporation and

8    its subsidiaries?

9          A.   In 2003 --

10         MR. NOLAN:  Which question do you want

11   him to answer?

12         A.   What period?

13         Q.   2004, 2003, 2004, during that period of time,

14   who were the accountants for First Hartford?

15         MR. NOLAN:  Mr. Kenna, please --

16         MR. KENNA:  Please, please, please --

17         MR. NOLAN:  2003 or 2004?

18         MR. KENNA:  Oh, come on, come on.

19         MR. NOLAN:  You said, 2003, 2004, 2003.

20         Q.   Who were they in 2003, sir?

21         A.   Kostin Ruffkess.

22         Q.   And who were they in 2004?

23         A.   Kostin Ruffkess.

24         Q.   And wasn't it Kostin Ruffkess right up until

1    April of 2005 or thereabouts?

2         A.   The whole entire year of 2005 it was Charron,

3    Carlin and --

4         Q.   Why are you looking at that document?

5         A.   I just --

6              MR. NOLAN:  He can look at anything he

7    wants.

8         A.   -- wanted to see, see if the certificate --

9    I'm sorry.  They go by CCR, and a lot of times I just

10   forget the name, but it's Carlin, Charron,

11   C H A R R O N, & Rosen.

12        Q.   What page are you looking at on Exhibit 23,

13   sir?

14        A.   Page 30 of 109.

15        Q.   And what are you testifying here to, are you

16   naming somebody who is --

17        A.   That they are the accountant for the year

18   ended 4/30/2005.

19        Q.   Who?

20        A.   Carlin, Charron & Rosen.

21        Q.   All right, so for a period of time in --

22   well, for 2003 it was Kostin Ruffkess or whatever --

23        A.   Ruffkess.

24        Q.   Yes.  For 2004 --

1                         MR. NOLAN:  Objection --

2           Q.    -- it was Kostin Ruffkess, is that right?

3                         MR. NOLAN:  Objection.  Wait a minute --

4           Q.    And they're --

5                         MR. NOLAN:  Wait a minute, please.  Stop

6           your --

7                         MR. KENNA:  Hold, you can object.

8                         MR. NOLAN:  I just said wait a minute

9           because you keep talking so I can object and put my

10          objection on the record.  Do you mean calendar year or

11          fiscal year?  It's a simple question.

12                        MR. KENNA:  I'm asking the questions.

13          He can ask me if he's got a problem --

14                        MR. NOLAN:  Well, I'm going to object to

15          it and instruct him not to answer it --

16                        MR. KENNA:  You can object --

17                        MR. NOLAN:  Okay.

18                        MR. KENNA:  You're instructing him not

19          to answer those questions?

20                        MR. NOLAN:  Yes, because your question

21          is unclear.

22                        MR. KENNA:  Oh, you are really out of

23          bounds now, sir.

24                        MR. NOLAN:  Really?

80

```
 1                         MR. KENNA:  Yes, you are.

 2                         MR. NOLAN:  I'm suggesting that you ask

 3        him --

 4                         MR. KENNA:  Yes, you are.

 5                         MR. NOLAN:  -- for a fiscal year or a

 6        calendar year --

 7                         MR. KENNA:  You're out of bounds, you're

 8        out of bounds.

 9                         MR. NOLAN:  Don't shake your finger at

10        me.

11           Q.   I ask you to turn to Page 74 of 109 on this

12        Exhibit 23.  Do you have that?

13           A.   Yes.

14                         (Pause).

15           Q.   Now, under item thirteen on Exhibit 23,

16        certain relationships and related transactions, do you

17        see that in the middle of the page?

18           A.   Yes, I do.

19           Q.   There's the statement under sub A, sub A,

20        other notes payable to the Journal Publishing have been

21        reduced by $84,000 to $193,000 at April 30, 2005 and

22        were subsequently paid, do you see that?

23           A.   Correct.

24           Q.   Do you -- is it correct, sir, that at some
```

KACZYNSKI REPORTING

1    Q.   Now, did -- were you as a director of the

2    corporation in June of 2005, sir, aware that a judge of

3    the Maine Superior Court had characterized First

4    Hartford Corporation's action in this piece of

5    litigation, this case, as displaying a clear lack of

6    good faith in its dealing with its shareholder in

7    violation of its duty to that shareholder?

8    A.   That's what it says.

9    Q.   Did -- now, when you, when the corporation

10   sends out proxy materials to its shareholders --

11   A.   Correct.

12   Q.   -- in anticipation of an annual meeting of

13   the shareholders, it tells its shareholders, does it

14   not, about litigation that is then ongoing between the

15   corporation and others; in particular, if there's

16   litigation ongoing between the corporation and the

17   shareholders, it tells the shareholders about that,

18   doesn't it?

19            MR. NOLAN:  Are you saying as a general

20   matter that's true?

21            MR. KENNA:  As a general matter.

22            MR. NOLAN:  And you're not entering any

23   concept of materiality?

24            MR. KENNA:  Do you have an objection,

KACZYNSKI REPORTING

1    Mr. Nolan --

2                    MR. NOLAN:  Yes, I do, I object to the

3    question.  You're asking for a legal conclusion, and

4    he's not a lawyer.  He's not going to answer --

5        Q.    I just asked you, you know, when you, when

6    the corporation -- I don't think I really should have

7    to repeat this, but I can understand with Mr. Nolan's

8    interruption why you might have lost the train of

9    thought.  What I want to know is, and you'll find right

10   in those proxy statements discussions of litigation

11   ongoing between the corporation and shareholders, is

12   that correct?

13                   MR. NOLAN:  Do you want to point him to

14   some particular page on some particular document?

15                   MR. KENNA:  Sure.  I always have trouble

16   finding pages.  I'm going to try to find a page on

17   Exhibit 22.

18       A.    22.

19       Q.    I think I found it, page 25 of 45.  Of

20   course, I could be wrong.  I do need to look at 21,

21   Exhibit 21.  Of course, Exhibit 22 at that page that I

22   just mentioned also mentions several litigations

23   ongoing between --

24       A.    Kaplan --

KACZYNSKI REPORTING