# Exhibit 1

Case 1:04-cv-10402-NMG    Document 60-2    Filed 08/07/2006    Page 1 of 18

United States District Court
District of Massachusetts

| | |
|---|---|
| RICHARD KAPLAN,<br><br>      Plaintiff,<br><br>      v.<br><br>FIRST HARTFORD CORPORATION,<br><br>      Defendant. | Civil Action Nos.<br>04-10402-NMG<br>05-10320-NMG<br>06-10424-NMG<br>CONSOLIDATED |

MEMORANDUM OF DECISION

GORTON, J.

This matter is a consolidation of three related cases, each arising from allegations that the defendant violated federal securities law by making material misstatements and omissions in each of three proxy statements.

The parties appeared for a bench trial before this Court on May 15 and 16, 2006. The Court now publishes its findings of fact and conclusions of law.

I. **Findings of Fact**

1. The plaintiff, Richard Kaplan ("Kaplan"), is (and was at all relevant times) a shareholder of the defendant, First Hartford Corporation ("FHC"). Kaplan is the beneficial owner of approximately 19.1% (591,254 shares) of FHC's outstanding common stock.

-1-

2. FHC is a Maine corporation with its principal place of business in Manchester, Connecticut. It became a public company in the 1960s and is primarily engaged in the acquisition, development and management of real estate.

3. The common stock of FHC is registered under Section 12(g) of the Securities Exchange Act of 1934 ("the Exchange Act"). Shares of FHC are traded "over the counter" and not listed on any exchange.

4. The current board of directors of FHC ("Board") is comprised of Neil Ellis ("Ellis"), Stuart Greenwald ("Greenwald") and David Harding ("Harding"). All three directors are also officers of FHC: Ellis is president, Harding, vice president and Greenwald, secretary and treasurer. Ellis owns approximately 43% (1,325,387 shares) of FHC's common stock.

5. Between February, 1986, and January, 2004, FHC held no shareholder meetings. As of the day of the 2004 shareholder meeting, Ellis, Greenwald and Harding had been serving as directors since 1966, 1980 and 1998, respectively. Greenwald and Harding had agreed to join the Board at the request of Ellis, and Harding was added after the death of a previous director/officer, Leonard Seader ("Seader").

6. FHC was in poor financial condition during the 1980s and 1990s. It filed a petition for, and subsequently emerged from, reorganization under the federal bankruptcy code in the 1980s.

From 1990 through 1998, its financial statements were not audited by outside certified accountants.

7. Within the past several years, FHC's financial performance has improved and the market value of its stock has increased. In 1999, FHC reinstituted the use of independent accountants.

8. Neither the Board itself nor any shareholder has proposed a candidate for director.

9. Kaplan challenges three proxy statements issued by FHC. The first was mailed on or about December 29, 2003 ("Proxy I"), for a meeting of shareholders held on January 22, 2004 ("Meeting I"). It solicited shareholder votes for the election of directors and to approve a stock option plan that had been adopted by the Board in December, 2003 ("the Stock Option Plan"). Pursuant to the subsequent vote of the shareholders, Ellis, Greenwald and Harding were elected to the Board of Directors and the Stock Option Plan was approved.

10. Shortly after Meeting I, a special meeting of the Board was called at which it not only authorized the implementation of the Stock Option Plan but also authorized so-called "put options" despite the fact that they had not been discussed or voted upon at the prior meeting of the shareholders. The award of put options permitted the recipient employee (depending upon his or her longevity with the company) to require FHC to buy his or her

vested stock options for a pre-determined price which was higher than the grant price. Consequently, the put option provided a guaranteed financial benefit to plan participants who remained employed by FHC.

11. The second proxy was mailed on or about January 26, 2005 ("Proxy II"), for a meeting of shareholders held on February 24, 2005 ("Meeting II"). That proxy solicited votes for the election of directors and with respect to Kaplan's proposal to amend the bylaws to require that 80% of the Board be "independent". As a result of Meeting II, Ellis, Greenwald and Harding were re-elected to the Board by the shareholders and Kaplan's proposal was defeated.

12. The third proxy was mailed on or about October 26, 2005 ("Proxy III"), for a meeting of shareholders held on November 30, 2005 ("Meeting III"). Proxy III solicited shareholder votes for the election of directors, to re-ratify the Stock Option Plan that the shareholders had approved in 2004 and to approve the plan for put options that had been implemented at the same time as the Stock Option Plan but which had not been reviewed or approved by shareholders. As a result of Meeting III, Ellis, Greenwald and Harding were re-elected to the Board by the shareholders and the Stock Option Plan was re-ratified.

13. Multiple business transactions between FHC and Ellis (generally conducted through companies owned by Ellis and/or his

-4-

relatives) have occurred during the past 25 years. Ellis's motivation for many of those transactions was to keep FHC solvent. Examples of "related transactions" between FHC and Ellis include the following:

> a) guarantees by Ellis of loans to FHC, many of which were secured by interests in the ventures with respect to which the loans were obtained; and
>
> b) exchanges of real property and ownership interests between FHC and companies associated with Ellis.

14. In the mid-1980s, FHC participated in the formation of a partnership for the purpose of developing a shopping center in Lubbock, Texas. FHC owned a 70% interest in the property, the bank which had loaned FHC money to develop the property owned 25% and a third party owned 5%. FHC and the lender both encountered financial difficulties.

15. In order to avoid foreclosure of the property by the FDIC, which succeeded to the interest of the lender, a company owned by the Ellises acquired a 99% ownership interest in the partnership holding the property (hereinafter, "Hartford Lubbock LP") in the mid-1990s. For tax purposes, an affiliate of FHC became general partner of Hartford Lubbock LP and was given a 1% interest. That transaction never received formal Board approval.

16. The books and records of Hartford Lubbock LP are kept at the headquarters of FHC. For the past 5 years or so, Ellis's two daughters have received from Hartford Lubbock LP $60,000 apiece each year. Payments have also been made to Ellis's son-

in-law.

17. In the 1990s, FHC and its management engaged in litigation with the United States Department of Housing and Urban Development ("HUD") with respect to certain FHC properties. As part of a settlement with HUD, Ellis and Greenwald voluntarily consented to refrain from any involvement in HUD-insured properties for five years.

18. Richmond Realty, LLC ("Richmond") was formed for the purpose of managing HUD-insured properties which FHC was forbidden to manage after the settlement agreement with HUD. Harding was president of Richmond until January, 2003, when his wife succeeded him as president and he became vice president. Harding's position as president was disclosed in the proxy statements but his position as vice president was not.

19. Richmond currently manages a property called "Scitico Gardens" which is owned by the Ellises. There is no written agreement governing the relationship between Richmond and FHC but there is substantial intermingling of funds between the two. All of Richmond's books and records are kept at the headquarters of FHC, the facilities and personnel of FHC are utilized by Richmond, and money is transferred between the two companies.

20. Because FHC was unable, for credit reasons, to obtain a loan for the development of a certain Connecticut property, a company owned by the Ellises, Journal Publishing Co., secured a

loan on behalf of FHC for $1,575,000 in 2000. Journal Publishing loaned that amount to an FHC affiliate, Putnam Parkade, Inc. (hereinafter, "the Putnam Parkade loan"), in exchange for a promissory note the terms of which had been set by the original lender to Journal Publishing.

21. The terms of the Putnam Parkade loan were very favorable to Journal Publishing, entitling it not only to interest payments at the rate of prime plus one percent per year but also to "participation payments" consisting of 95% of the cash flow from the property and 95% of the net proceeds from any sale or refinancing of the property. Journal Publishing did not receive, nor was it intended to receive, the participation payments and the loan was paid off by Putnam Parkade in 2004.

22. Proxies I, II and III did not disclose the fact that FHC had not held a meeting of shareholders (or an election of directors) since 1986. The proxies also omitted, or misstated, certain disclosures that were required by federal regulations or which related to transactions in which FHC management/directors had a personal interest.

23. There is no evidence that, if such undisclosed information had been disclosed, the votes taken at the FHC shareholder meetings would have been different or, if so, that such votes would have produced different results.

II. **Conclusions of Law**

A. It is a violation of § 14(a) of the Exchange Act to make a solicitation

> by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

SEC Rule 14a-9(a), 17 C.F.R. § 240.14a-9. See also Exchange Act, § 14(e), 15 U.S.C. § 78n(e).

B. Shareholders alleging a violation of the proxy rules have a private right of action under the Exchange Act, § 14(a), 15 U.S.C. § 78n(a). Royal Bus. Group, Inc. v. Realist, Inc., 933 F.2d 1056, 1059 (1st Cir. 1991) (citing J.I. Case Co. v. Borak, 377 U.S. 426 (1964)).

C. As a general matter, the prohibition against material misstatements applies only where the proxy solicitor has a duty of disclosure. Cf. Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26 (1st Cir. 1987) ("Even if information is material, there is no liability under Rule 10b-5 unless there was a duty to disclose it."); Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 641 n. 17 (3d Cir. 1989) ("Disclosures mandated by law are

presumably material.") (citation omitted).[1]

D. However, once a disclosure is made (whether mandatory or not) a duty arises to make that disclosure "complete and accurate", which may compel the corporation to provide additional material facts. Roeder, 814 F.2d at 26 (citations omitted).

E. SEC Regulation 14A, 17 C.F.R. 240.14a-1 et seq., sets forth numerous items that must be disclosed in any proxy solicitation. Required disclosures include, but are not limited to: 1) the corporation's annual financial report, 2) various other financial data, 3) information relating to current management/directors and nominees to the board, 4) disclosures of related transactions between the corporation and its management/directors, 5) information about the existence and operation of audit, nominating and compensation committees, 6) compensation and retirement plan information for management/directors and 7) indebtedness of management/directors to the corporation.

F. The standard for determining the materiality of omissions has been defined by the United States Supreme Court as follows:

---

[1] Claims brought under Section 10(b) of the Exchange Act and SEC Rule 10b-5 are subject to the same standard of materiality as claims brought under the federal proxy regulations. See Basic, supra.

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. ... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote ... [but just that it] would have assumed actual significance in the deliberations of a reasonable shareholder ... [i.e.,] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). Where a shareholder challenges a proxy solicitor's statement of belief or opinion, evidence of the solicitor's disbelief or undisclosed motivation may give rise to liability so long as the plaintiff also proves "that the statement was defective as to its subject matter". Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1096 (1991).

G.  The "total mix" of information available to a shareholder may include information outside of the proxy statement itself where, given the particular solicitation, a reasonable investor would be likely to consider such outside information. See In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 374 n.6 (E.D.N.Y. 2003).

H.  In this case, a reasonable FHC shareholder, being asked to vote upon important issues such as the election of directors, approval of a stock option plan and a shareholder proposal seeking more independence in the board, is presumed to have read each 10-K annual report which FHC provided with each proxy statement. Cf. id. at 374 & nn. 5-6 (explaining that investors

are expected to have knowledge of publicly available SEC filings, especially since 1996, when the SEC required domestic public companies to file electronically).

I.  In defining the general standard imposed by the federal proxy rules, the First Circuit Court of Appeals has held that

> federal law is satisfied as long as the proxy materials fully and fairly set forth the relevant and material facts from which a reasonable shareholder may draw his own conclusions as to how to vote.

New England Anti-Vivisection Soc'y, Inc. v. U.S. Surgical Corp., Inc., 889 F.2d 1198, 1202 (1st Cir. 1989).

J.  While the standard of materiality does not vary depending upon whether the drafter of a challenged proxy statement was a corporate insider or an outside party, a court may consider the interests of the drafter when determining whether a material omission or misstatement has been made. Pavlidis v. New England Patriots Football Club, Inc., 737 F.2d 1227, 1231 (1st Cir. 1984) (stating that under certain circumstances "a self-dealing insider may have a 'heavier burden of disclosure' in the sense that he will find it more difficult to convince the court that he has met the requirements of § 14(a)").

K.  Thus, the materiality of a corporate transaction that could personally benefit the company's management, directors or their relatives, requires a contextual assessment.  Regarding disclosure of such transactions, the SEC instructs that:

-11-

> [t]he materiality of any interest is to be determined on the basis of the significance of the information to investors in light of all the circumstances of the particular case. ...[T]he relationship of the parties to the transaction with each other and the amount involved in the transactions are among the factors to be considered in determining the significance of the information to investors.

Instructions to Item 404(a) of SEC Regulation S-K, 17 C.F.R. § 229.404.

L.  Whether non-disclosure of improper conduct is material depends upon the relationship between that conduct and the particular solicitation at issue.  In the <u>Pavlidis</u> case, <u>supra</u>, the First Circuit Court of Appeals reasoned that, while a "breach of fiduciary duty involving self-dealing by a corporate officer would plainly be material to a proxy statement soliciting votes for the re-election of that officer", non-disclosure of that misconduct was not material to a solicitation concerning whether shareholders should sell their stock at a particular price.  737 F.2d at 1236.

M.  Reliance is not an element of proof in misleading proxy claims.  Thus, the plaintiff need not prove that he relied on the proxy's defect in determining how to vote.  See <u>Mills</u> v. <u>Elec. Auto-Lite Co.</u>, 396 U.S. 375, 384-85 (1970); <u>Stahl</u> v. <u>Gibraltar Fin. Corp.</u>, 967 F.2d 335 (9th Cir. 1992).

N.  With respect to causation, the Supreme Court has explained that,

> [s]o long as the misstatement or omission was material, the causal relation between violation and injury is sufficiently

established ... if "the proxy solicitation itself ... was an essential link in the accomplishment of the transaction". TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 444 (1976) (quoting Mills, 396 U.S. at 385). The court of appeals in the Stahl case reasoned that because materiality (an objective standard) is the "touchstone" of a proxy violation case, "it should not matter whether any particular shareholder was actually misled by the challenged misrepresentations". Stahl, 967 F.2d at 337.

O. Similarly, because the proxy rules are intended to "ensur[e] full and fair disclosure to shareholders", the fairness of a transaction following a challenged proxy solicitation is not a defense to liability. Mills, 396 U.S. at 382 & n.5 (reasoning that "it is pure conjecture to assume that the fairness of [a] proposal will always be determinative of [shareholders'] vote").

P. Although plaintiff provided no direct proof that FHC acted in bad faith, FHC was negligent with respect to the composition of its proxy statements and observance of corporate formalities.

Q. In considering Proxies I, II and III, and their accompanying 10-Ks, the Court concludes that the following matters were either fully and fairly disclosed or, if not, were immaterial:

> 1) the denomination of Meeting I as an "annual meeting" and the disclosure of the tenure of the then-current Board of Directors;

2) the description of the functions of FHC's audit and compensation committees which FHC was not obligated to have;

3) the failure to disclose in Proxy I all known owners of 5% or more of FHC common stock;

4) the misstatement that FHC management and directors had all complied with SEC reporting requirements;

5) the financial performance graphs included within the proxy statements, notwithstanding the lack of a statement limiting their applicability to small sales of stock;

6) the reported process for consideration of candidates to the Board of Directors;

7) the characterization of, and recommendation by the Board against, Kaplan's shareholder proposal, see Va. Bankshares, 501 U.S. at 1095-96; New England Anti-Vivisection Soc'y, 889 F.2d at 1204;

8) the failure to describe the put options in Proxies I and II because those omissions were effectively cured in Proxy III; and

9) the characterization of non-qualified options as "performance-based compensation" because the terms of the employee compensation plan sufficiently disclosed that some of the compensation would not be directly tied to company performance.

R.  Although none of the non-disclosures relating to business relationships between FHC and its management was materially misleading if considered in isolation, the non-disclosures taken as a whole cause concern.  See Gould v. Am. Hawaiian Steamship Co., 319 F. Supp. 795, 809 (D. Del. 1970) (stating that misstatements and omissions which are "only slightly inaccurate or misleading" may "amount to inadequate disclosure" when viewed in total).

-14-

S. The proxy statements and 10-K filings indicate, as a general matter, that Ellis had (and continues to have) a personal interest in a number of business transactions with FHC. Thus, a reasonable stockholder would likely consider such information, and proceed with caution, when voting for officers or with respect to transactions that could benefit Mr. Ellis personally. The insufficient disclosures of Ellis's transactions with FHC are problematic because they do not permit an investor to determine the extent of Ellis's self-interest. Cf. Shaev v. Saper, 320 F.3d 373, 382-83 (3d Cir. 2003) ("That an investor could hypothetically conduct research to clarify ambiguities and discover omissions in the proxy statement does not relieve the Board of its obligations under Rule 14a-9.").

T. Similarly, although transactions which took place many years ago while FHC was insolvent may be of little consequence today, such transactions are significant in confirming Ellis's peremptory control over FHC's management and the Board and the comprehensive lack of proper corporate governance.

U. Consequently, FHC should have disclosed 1) the material terms of those transactions in which Ellis or his family were personally interested, 2) details concerning potential benefits and detriments to Ellis personally and 3) the relationship between Richmond Realty, Harding, Ellis and FHC.

V. Because FHC made misleading statements and omissions in

Proxies I, II and III which, by a narrow margin, exceeded the threshold of materiality, the plaintiff is entitled to some relief.

W. Because, however, 1) those non-disclosures were rendered less serious by virtue of FHC's dire financial status, 2) there is no evidence that shareholders would have voted differently had more complete disclosures been made by FHC and 3) many of plaintiff's claims have been rendered moot by the passage of time and the efforts of FHC to provide more accurate disclosures with each succeeding proxy statement, the Court will award only prospective relief, consisting of an order that future proxy statements shall comply with this decision and that FHC shall provide a copy of this decision with its next proxy statement.

**ORDER**

In accordance with the foregoing Memorandum of Decision, judgment will enter for plaintiff on Count I of his consolidated complaints. Defendant is hereby ordered that future proxy materials shall comply with this Court's decision, a copy of which defendant shall provide to its shareholders with the next proxy statement.

**So ordered.**

_____
Nathaniel M. Gorton
United States District Judge

Dated: July 7, 2006